Defendant Ford Motor Company ("Ford") appeals from the judgment of the trial court which granted plaintiffs Virginia and Leon Manigault relief from a defense verdict on the basis of a fraud allegedly perpetrated upon the court. For the reasons set forth below, we reverse the order granting relief from judgment.
On April 3, 1993, Leon and Virginia Manigault were involved in a motor vehicle accident in the 1987 Ford Crown Victoria immediately after starting the vehicle. Leon Manigault suffered a brain hemorrhage and is comatose. On March 24, 1995, after the Manigaults no longer had the vehicle,[1] Virginia Manigault, individually and as guardian for Leon Manigault, filed this action against Ford and Mullinax Ford ("Mullinax") which sold and serviced the vehicle.[2] In relevant part, plaintiffs alleged that the cruise control system of the vehicle was defectively manufactured and/or designed, causing the vehicle to jump into gear and rapidly accelerate without driver application of the accelerator pedal, thus rendering the vehicle unsafe and unfit for its intended purpose; that Ford was negligent in connection with the manufacture, design, and/or supply of the vehicle; that Ford failed to warn purchasers about the possibility of a sudden acceleration; that Ford failed to incorporate adequate safety equipment into the vehicle to protect purchasers; and that Ford's failure to warn of a known danger constituted a conscious disregard for the rights and safety of others that had a great probability of causing substantial harm.
Ford denied liability and the matter was subsequently assigned to a visiting judge.
On June 4, 1997, Ford filed a motion in limine seeking to exclude a letter issued by the National Highway Traffic Safety Administration ("NHTSA") to Ford on December 31, 1996. This letter[3] provided in relevant part as follows:
 The National Highway Traffic Safety Administration (NHTSA) has received a petition (copy enclosed) from the Center for Automobile Safety, the Florida Public Interest Research Group, and others for an investigation to determine whether alleged sudden acceleration of certain 1983 through 1986 Ford Motor Company vehicles constitutes a defect which could result in a safety recall campaign.
 The petitioners base their request on 219 consumer reports of sudden acceleration of 1983 through 1986 Ford vehicles equipped with 3.8 and 5.0 liter engines and automatic transmissions, and claim that these incidents have resulted in 130 accidents, 48 injuries, and 4 fatalities. A search of our files disclosed a number of additional similar complaints, including those provided by Ford in response to our Preliminary Evaluation (PE85-065), which was closed on August 5, 1986. In total, we have identified 439 consumer reports which cite 193 accidents, 106 injuries, and 5 fatalities relating to alleged sudden acceleration of these vehicles. We have enclosed a copy of each of these consumer reports for your information.
Ford asserted that the letter contained inadmissible hearsay and that its probative value was outweighed by its prejudicial effect. Plaintiffs' counsel argued that this letter demonstrated that Ford had notice of a defect in its cruise control system and was admissible pursuant to Babb v. Ford Motor Co. (1987),41 Ohio App.3d 174. The trial court granted Ford's motion inlimine. (Tr. 36).
Plaintiff's counsel also informed the court that he had learned on the previous day that there is a reading room at Ford's Dearborn Michigan headquarters in which hundreds of complaints of unintended acceleration are maintained. Plaintiffs therefore moved to preclude Ford from representing to the jury that plaintiffs could not produced evidence of other instances of cruise control malfunctions resulting in sudden acceleration. In this connection, plaintiffs sought permission from the court to depose the records custodian of this reading room. Ford insisted, however, that these records contained inadmissible hearsay and that plaintiffs could not say with certainty that any of the complaints involved a claim of a faulty cruise control mechanism or otherwise bore a substantial similarity to the instant matter. The trial court denied plaintiffs' motion. (Tr. 63).
The matter proceeded to a jury trial on June 11, 1997. In opening statement, counsel for Ford stated as follows:
 Now, the plaintiffs have a couple of experts who are going to try to tell you about this theory he's come up with. The way this theory has to happen is there are eleven (11) wires coming out here, and they're going to tell you for this to happen, some of those wires have to either be bare from insulation coming off, pinches, broken. I need a faulty connecter. I need something to go wrong with not one of those wires, but two of them and not just any two of them. Two specific ones. (Exhibit 1, TR 100).
 The other thing you're going to find out is that they've talked about these wires and which ones have to go bad and the mechanical dump valve. They are going to have to tell you they have never tested to see if this can happen. They have gone out and they have `jerry-rigged' some exhibits and they have deliberately shorted some things, but no one for the plaintiff is going to come in and tell you they have ever seen a car that has wire No. 2 or 3 with a problem, and wire number 11 that has a problem. (Exhibit 1, TR 101).
 But there will be no evidence from anyone that this has ever happened in the real world; that anyone has ever duplicated it. An in none of the plaintiff's expert tests or video did they do this. They went in instead and they just automatically put shorts in mechanically or electrically. They didn't actually do what they are claiming happened here. And Mr. DeClercq knows more about cruise control than anybody who is going to come to talk to you. (Exhibit 1)
For their case, plaintiffs demonstrated, inter alia, that in February 1992, they had taken the vehicle for servicing at Mullinax Ford. At this time, Leon Manigault complained that the vehicle jumps out of gear, accelerates by itself, "idle races then jumps into gear." Mullinax Ford did not examine the cruise control system at this time. Plaintiffs also presented evidence that in November 1992, John Manigault observed an incident during which the vehicle accelerated away immediately after Leon Manigault started it. John Manigault testified that he saw the brake lights of the car come on but the vehicle did not stop and his father later told him that he had to turn off the ignition in order to regain control of the vehicle. The vehicle was towed to Mullinax Ford for repairs and again the cruise control system was not examined.
John Manigault also testified that immediately after the April 3, 1992, collision, he observed that the brake lights of the vehicle were on. The vehicle did not stop until after it collided with a house, however.
Plaintiffs presented expert testimony to describe how the cruise control systems in 1987 Crown Victorias could suddenly and rapidly accelerate without the driver depressing the gas pedal. This testimony indicated that when the ignition of the vehicle is turned on, the servo which operates the throttle arm of the cruise control system is also turned on. If the vacuum and vent lines become damaged, the servo goes into operating mode and pulls the throttle wide open, causing acceleration. Alternatively, if ground connection to the speed amplifier is loosened, then either the vacuum or vent wires go to the ground, a wide open throttle will occur, causing acceleration. In this instance, according to plaintiffs' expert, "[t]he most probable thing that happened was a bad amplifier ground with either vacuum or vent line grounding out." (Tr. 470). Plaintiffs also indicated that it is extremely common for these wires to become damaged or their connections to become loose or corroded. Moreover, plaintiffs demonstrated that environmental factors cause this problem to be of an intermittent nature.
For its defense, Ford's expert admitted that only the accelerator pedal and the cruise control systems go to the throttle plate of a vehicle so that only driver error or a defect in the cruise control system could cause sudden unintended acceleration. With regard to cruise control malfunctions, however, Ford's expert asserted that the requisite simultaneous multiple electronic malfunctions could happen theoretically but were not possible in the real world setting. He further testified that if such a malfunction did occur, the driver would simply have to brake in order to stop. He admitted, however, that by NHTSA definition, unwanted sudden acceleration is accompanied by ineffective brakes.
During the course of the trial, plaintiffs sought to introduce the deposition testimony obtained in Selman v. Ford Motor Co.
(E.D.Ark. 1996), No. PB-V-94-474, of Ford employees Charles Best and Alan Updegrove. Plaintiffs asserted that this deposition testimony described what Ford did in response to cruise control complaints. The testimony indicates that Ford received complaints of sudden acceleration in Crown Victorias and other "Panther Cars" (i.e., Crown Victorias, Grand Marquis and Town Cars) from the early 1970's to 1989. These complaints were generally investigated by Ford's district engineers. In 1989, there was a substantial increase[4] in the number of sudden acceleration complaints and Ford's general office assembled a special projects team headed by Updegrove to perform field investigations into these complaints. The focus of the team was to determine whether the complaint could be verified through duplication or repetition of the incident.[5] The complaints were divided into various categories and one category included reports of the customer entering the vehicle, starting the engine and putting the vehicle into gear, resulting in the sudden acceleration. Approximately sixty per cent of the cases which the group investigated fell into this category.
The project was discontinued in 1992. Ultimately, Ford did not identify a cause for the claims, and the group concluded that driver error was responsible for the acceleration. In 1992, Ford began to install brake/shift interlocks to require the driver to have his or her foot on the brake rather than the accelerator in order to engage the transmission. This device did not completely eliminate complaints of unintended acceleration, however. (Updegrove depo. at 27); (Best depo. at 55).
Best described high idle problems caused by throttle position sensors. He explained that in dealing with certain sudden acceleration complaints from Hertz Rental Cars, the throttle positions sensors and command modules of the vehicle were removed. One exhibit focuses upon vehicles with throttle position sensors built before May 28, 1987. Other exhibits to the Best deposition include complaints of unintended acceleration from the wife of William Clay Ford (sister-in-law of Henry Ford), the Vice President of Dollar Rent A Car, complaints involving fatalities, one involving a Secret Service Agent, and numerous affidavits in which the affiant described an unintended acceleration incident involving a Ford product. In some of these instances, Ford repurchased the vehicle. There were also documents relating to Ford's 1991 contact with Junior D'amato, an automotive technician who also has a radio program which addresses automotive issues. These documents indicate that D'amato had repaired two vehicles for "runaway conditions" and corrected the problem by replacing the throttle position sensors. Following one of these repairs, Ford employees took the throttle position sensor and returned it to D'amato a few weeks later.
The trial court denied plaintiffs' request to introduce the deposition transcripts to the jury. (Tr. 714).
In closing argument, counsel for Ford stated in relevant part as follows:
 Now Mr. Murray mentioned the risk-benefit test. The only evidence we have here is that this cruise control was in tens of millions of vehicles made by Ford alone. If you want to add the other manufacturers in, hundreds of millions, driven for billions and billions of miles. And this defect, this occurrence that they are claiming happened once, maybe twice, even if you want to talk about their church incident, on a car with 113,000 miles, and not on any of these other hundreds of millions of vehicles, through billions of miles, doesn't meet the risk benefit test. Doesn't meet any consumer expectation. There is no evidence of defect, and there is certainly no evidence that there was a defect in the Manigaults vehicle which caused this accident.
 So what do plaintiffs come back to? They come back and ask you to tell us what we should have warned the Manigaults that this could happen. There is nothing to warn about. It was a purely theoretical possibility. It had never happened. Ford had no duty to warn.
 So what's the last failback position? We should have told Melanize [sic Mullinax] how to look for it. You can't tell Melanize [sic Mullinax] to look for something that doesn't happen in the real world. (Exhibit 1, TP. 1065-10663).
* * *
 So in the end, all we have is a vehicle with 113,000 miles that's now gone. We never got to look at it. No evidence that this has ever happened in any other vehicle at any time. No evidence it happened here. No explanation for how this accident happened. (Exhibit 1, TR 1066-1067).
* * *
 Mr. Sero came up with a theory we told you he'd come up with. And as Mr. DeClercq told you, any engineer can go in and can manipulate any electrical system in any product and make it fail. If you break enough wires, you strip enough wires, you short-circuit enough wires, you can make anything happen. (Exhibit 1, TR 1056-1057).
On June 23, 1997, the jury rendered a verdict for Ford. On July 7, 1997, plaintiff moved for a new trial and asserted that the trial court erred in excluding from evidence a letter sent to Ford by the NHTSA and the depositions of Charles Best and Alan Updegrove. The trial court denied this motion on August 11, 1997.
On September 9, 1997, plaintiffs filed a motion for relief from judgment. Plaintiffs asserted that Ford perpetrated a fraud upon the court in connection with its argument to the court and jury that it was impossible for a vehicle to suddenly accelerate from a stationary position, and that the NHTSA letter and Best and Updegrove depositions demonstrate that Ford knew that such sudden accelerations could occur.
Immediately after filing this motion, plaintiffs filed an appeal to this court, see Manigault v. Ford (September 10, 1997), Cuyahoga App. No. 73147, thereby divesting the trial court of jurisdiction. See Majnaric v. Majnaric (1975), 46 Ohio App.2d 157,158-159. On October 1, 1997, the trial court, apparently unaware that plaintiffs had filed a notice of appeal, journalized an order denying the motion for relief from judgment. This order was of no effect.
On October 30, 1997, this court temporarily remanded the matter to the trial court in order to once again vest the trial court with jurisdiction in order to rule upon the motion for relief from judgment. This temporary remand expired on December 17, 1997. Thereafter, plaintiffs filed a motion for reconsideration and further relief pursuant to Civ.R. 60 (B). On December 3, 1997, the judge to whom the matter was originally assigned scheduled a hearing. Following a challenge by Ford, this hearing was canceled and in an entry journalized on December 19, 1997, the visiting judge to whom the matter was tried denied plaintiff's motions. This order was also of no effect since it was journalized after the expiration of our remand and we again temporarily remanded the matter for ruling on the motion for relief from judgment.
Following the second remand, the matter was reassigned to the judge originally assigned to hear it. The court held an evidentiary hearing on the motion on March 25, 1998. Plaintiffs asserted that pursuant to this court's decision in Babb v. FordMotor Co. (1987), 41 Ohio App.3d 174, the trial court erred in excluding the NHTSA correspondence, and that these documents and the Best and Updegrove depositions demonstrate that Ford falsely stated that sudden acceleration could not happen in the real world. Moreover, plaintiffs asserted that Ford acted fraudulently in permitting its expert Victor Declercq, a Ford engineer at Dearborn, to testify without providing him with the information concerning Updegrove and Best's investigations at Dearborn. Counsel for plaintiffs stated that he repeatedly implored the trial court that Ford's arguments amounted to fraudulent concealment and were prejudicial. (Tr. 41).
Plaintiffs also presented the testimony of Patricia Kuczak, Ronald Campbell, Sam Sero and Junior D'amato. Kuczak testified that in 1985, she experienced an unintended acceleration incident while driving her Mercury Station wagon. When her husband next started the vehicle, it was in full throttle. Campbell, a special agent for the Virginia State Police testified that in September 1992, he experienced an unintended sudden acceleration in his 1991 Mercury Grand Marquis. There was a second incident in July 1992. Ford ultimately repurchased this vehicle.
D'amato, the automotive technician who had dealt with Ford in 1991 following his repair of two vehicles for "runaway conditions," testified that in his shop, he has investigated customer complaints of unintended acceleration and by simply allowing a vehicle to idle for long periods of time while in park. By so doing, he has observed vehicles with "screaming wide open" throttle. He has determined that in vehicles with cruise control, if the vent wire comes into contact with ground, the accelerator will go into wide open throttle. D'amato stated that he reported his findings to Ford and Ford employees took a throttle position censor and returned it to him a few weeks later. A few years later, D'amato witnessed an incident where a woman hit a bus, the brake lights were on and the motor was racing.
Sero, an engineer who testified at trial for plaintiffs, testified that he was aware of a number of instances where Ford remedied complaints of unintended acceleration by simply disengaging the cruise control systems.
Ford insisted that it had not made a false representation and had indicated to the jury not that sudden accelerations do not happen, but that cruise control malfunctions had never been verified as the cause of sudden accelerations in the real world. Ford presented the testimony of its trial expert, Victor Declercq, who testified that the cruise control mechanism cannot engage unless the vehicle is traveling at twenty-six miles per hour and that the brakes will deactivate the system. He further explained that the wires for the system are encased in a harness and are therefore protected. If a wire is damaged, that would be evident and cause a recurring, rather than intermittent, problem which would be replicated.[6] He further testified that the NHTSA conducted investigations into unintended acceleration and noted that it occurred only after the vehicle was already traveling at considerable speed and, by applying the brakes, the vehicle could be stopped without crashing.
Following the evidentiary hearing, the trial court granted plaintiffs' motions for relief from judgment, reconsideration, and further relief. In relevant part, the trial court wrote:
 The Court has undertaken a review of the various documents submitted by plaintiffs, and has determined that the following substantiate plaintiffs' contention that Ford perpetrated a fraud upon the Court:
(1) The December 31, 1986 NHTSA letter;
(2) The testimony of Alan Updegrove and Charles Best:
 This Court notes Ford's various evidentiary objections to this Court's consideration of the above documents, recognizes same, and permits Ford to preserve those objections for appeal. However, upon review of the deposition transcripts, as well as the NHTSA letter, the Court finds support for plaintiffs' contention that these documents substantiate plaintiffs claim that Ford has known that defects exist in its cruise control systems which cause sudden acceleration in stationary vehicles. Hence, plaintiffs have been severely prejudiced by the trial court's exclusion of this evidence.
 26. Ford's representations to the jury that there had never been a sudden unintended acceleration occurrence in hundreds of millions of vehicles equipped with cruise control systems; that an occurrence similar to the Manigaults was a purely theoretical possibility; that such an occurrence does not happen in the real world; that there is no evidence that this had ever happened in any other vehicle at any time and that there is nothing to warn about, constitute an intentional misrepresentation that entitles the plaintiffs to relief from judgment pursuant to Ohio Civ.R. 60(B)(3).
In light of the trial court's grant of plaintiffs' motion for relief from judgment, this court dismissed as moot appeal no. 73147, plaintiffs' direct appeal from the defense verdict. Manigault v. Ford (May 14, 1997), Cuyahoga App. No. 73147, unreported. Herein, Ford challenges the judgment of the trial court granting plaintiffs relief from judgment. Ford assigns five interrelated errors for our review.
Ford's assignments of error state:
 MOTION FOR RELIEF FROM JUDGMENT BECAUSE THE MATERIALS HE RELIED UPON DO NOT SUBSTANTIATE THE CONCLUSION THAT A FRAUD WAS PERPETRATED UPON THE COURT.
 JUDGE CALABRESE ABUSED HIS DISCRETION IN GRANTING APPELLEE'S MOTION FOR RELIEF FROM JUDGMENT BECAUSE HE IMPROPERLY BASED HIS DECISION ON EVIDENTIARY ISSUES RAISED AND RULED UPON AT TRIAL WHICH WERE SUBJECT OF APPEAL.
 JUDGE CALABRESE ABUSED HIS DISCRETION IN GRANTING APPELLEE'S MOTION FOR RELIEF FROM JUDGMENT BASED UPON MATERIALS WHICH LACKED APPROPRIATE EVIDENTIARY QUALITY NECESSARY TO SUPPORT A MOTION FOR RELIEF FROM JUDGMENT.
 JUDGE CALABRESE ABUSED HIS DISCRETION IN GRANTING APPELLEE'S APPELLEE'S MOTION FOR RELIEF FROM JUDGMENT IN FAILING TO ACKNOWLEDGE AND CONSIDER UNREFUTED EVIDENCE DEMONSTRATING THAT FORD DID NOT PERPETRATE A FRAUD UPON THE JURY OR THE TRIAL COURT.
 JUDGE CALABRESE ABUSED HIS DISCRETION IN GRANTING APPELLEE'S MOTION FOR RELIEF FROM JUDGMENT BASED UPON HIS IMPROPER USE OF RULE 60 (B) (5) AND BECAUSE THERE WAS NO BASIS FOR GRANTING RELIEF FROM JUDGMENT UNDER RULE 60 (2) (5).
Within these assignments of error, Ford maintains that plaintiffs relied upon an evidentiary issue in support of their motion for relief from judgment and this issue is properly the subject of an appeal. Ford further maintains that relief from judgment was erroneously granted in this instance.
Civ.R. 60 (2) governs motions for relief from judgment and provides in part:
 On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceedings for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59 (B); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; * * * (5) any other reason justifying relief from judgment. The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than one year after the judgment, order or proceeding was entered or taken.
The Ohio Supreme Court has summarized the requirements necessary to warrant relief from judgment pursuant to Civ.R. 60 (2) as follows:
 To prevail on a motion brought under Civ.R. 60 (B), the movant must demonstrate that: (1) the party has a meritorious defense or claim to present if relief is granted; (2) the party is entitled to relief under one of the grounds stated in Civ.R. 60 (B) (1) through (5); and (3) the motion was made within a reasonable time, and, where the grounds of relief are Civ.R. 60 (B) (1), (2) or (3), not more than one year after judgment, order or proceeding was entered and taken.
GTE Automatic Electric v. ARC Industries (1976), 47 Ohio St.2d 146
syllabus at paragraph two.
In addition, a motion for relief from judgment pursuant to Civ.R. 60 (B) may not be used as a substitute for a timely appeal. Doe v. Trumbull County Children Services Board (1986),28 Ohio St.3d 128; National Amusements, Inc. v. Springdale (1990),53 Ohio St.3d 60, 63; Justice v. Lutheran Social Service ofCentral Ohio (1992), 79 Ohio App.3d 439, 442. Thus, when a party merely reiterates arguments which concern the merits of the case and which could have been raised on appeal, relief under Civ.R. 60 (B) is not available as a substitute for appeal. Wozniak v.Tonidandel (1997), 121 Ohio App.3d 221, 228. The court inBeechler v. Beechler (1994), 95 Ohio App.3d 121 explained:
 Logically, therefore, every properly raised ground for relief from judgment necessarily involves granting relief for a reason that could not be considered in an appeal of the underlying judgment. The movant may not reiterate arguments which concern the merits of the case and which could have been raised on appeal.
Accord Justice v. Lutheran Social Service off Central Ohio,supra, at 442. See, also, Elyria Twp. Bd. of Trustees v.Kerstetter (1993), 91 Ohio App.3d 599, 602 ("The movant must allege new grounds for Civ.R. 60 (B) relief; it may not use the arguments it lost under the judgment to justify relief from judgment").
In this instance, the motion for relief from judgment and the supporting evidentiary materials focused upon the trial court's rulings with regard to the NHTSA letter, the Best and Updegrove depositions, and the materials from the unintended acceleration reading room in Dearborn, and the manner in which these evidentiary rulings influenced Ford's representations to the jury. Each of these matters was dealt with extensively at trial and the trial court rejected plaintiffs' argument that Ford was engaged in "fraudulent concealment." (Tr. 62). This matter is the proper subject of a direct appeal.
Plaintiffs insist that the matter may be pursued pursuant to Civ.R. 60 (B) because a fraud was perpetrated upon the court.
We note as an initial matter that The Ohio Supreme Court has defined the elements of fraud as follows:
 "The elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance."
Gaines v. Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, 55.
In Coulson v. Coulson (1983), 5 Ohio St.3d 12, 15, the Supreme Court acknowledged that "`* * * [a]ny fraud connected with the presentation of a case to a court is a fraud upon the court, in a broad sense.'" However,
 "`Fraud upon the court' is an elusive concept and must be defined narrowly:
 "`Fraud upon the court' should, we believe, embrace only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by the officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication. Fraud, interpartes, without more, should not be a fraud upon the court, but redress should be left to a motion under 60 (B) (3) or to the independent action."
Id., quoting 7 Moore's Federal Practice (2 Ed. 1971) 515, paragraph 60.33; accord Flowers v. Rigdon (1995), 101 Ohio App.3d 172,175.
Similarly, in Hartford v. Hartford (1977), 53 Ohio App.2d 79,83-84, the court stated:
 "Fraud upon the court," as used in regard to obtaining relief from judgment must be narrowly construed to embrace only that type of conduct which defiles court itself, or fraud which is perpetrated by officers of court so as to prevent judicial system from functioning in customary manner of deciding cases presented in an impartial manner, such as bribery of a judge or jury, fabrication of evidence by counsel, or prevention of an opposing party from fairly presenting his case.
In this instance, plaintiffs repeatedly informed the trial court that the disputed evidence demonstrated that Ford had received numerous complaints of unintended acceleration in its Panther cars and that a significant subgroup of the complaints involved situations where the acceleration occurs immediately after the ignition is turned on. Plaintiffs also demonstrated that Ford had conceded that unintended acceleration could only result from cruise control defects or driver error, and that new technology designed to eliminate driver error had not eliminated all complaints of sudden acceleration. Moreover, in 1991, D'amato discussed his findings with Ford regarding the throttle position sensors, and as D'amato explained at the hearing on the motion for relief from judgment, he was able to show that the cruise control wires can cause the vehicle to go into wide open throttle and that in two vehicles with a history of "runaway," he had observed normal idle accelerate into "screaming wide open throttle." The trial court permitted Ford to argue that the requisite malfunctions needed for the cruise control system to cause an unintended acceleration simply do not happen in the real world.
We therefore conclude that the trial court was fully informed that Ford's argument may prove to be untrue, thus negating the essential element of concealment or reasonable reliance. This information, moreover, precluded defiling of the court. The court's ruling followed receipt of this information and, without evaluating the correctness of the trial court's ruling, the judicial machinery regarding challenges to introduction of evidence performed in the usual manner. In short, plaintiffs are challenging the rulings on the evidence in dispute and the effect which the rulings in turn had upon the proceedings and these matters are properly reviewed upon direct appeal.
Because plaintiffs filed a direct appeal from the judgment rendered for the defense, see Manigault v. Ford (September. 10, 1997), Cuyahoga App. No. 73147, they may seek reinstatement of that appeal.
This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.
It is, therefore, considered that said appellant recover of said appellee their costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
SPELLACY, J., SWEENEY, J., CONCUR
 __________________________________ ANN DYKE PRESIDING JUDGE
N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22 (E). See, also S.Ct.Prac.R. II, Section 2(A)(1).
[1] Apparently, the vehicle was stolen while it was being stored by plaintiffs.
[2] Plaintiffs subsequently reached a settlement with this defendant.
[3] Plaintiffs also had a response to this letter from Ford which indicated that multiple electronic malfunctions would be required in order for the cruise control system to be activated without driver input and that cruise control malfunctions occur only when this system is turned on and the car is operated at thirty miles per hour or faster.
[4] Best testified that Ford received as many as one hundred complaints per month at the peak of this investigation and that this represented 10-15% of the total number of occurrences.
[5] Plaintiffs complained that Ford did not do a "failure mode analysis" to determine potential causes.
[6] Updegrove stated, however, that salty water entering connectors could cause intermittent conductivity.