McLEOD, Grdn., Appellant and Cross-Appellee,

v.

MT. SINAI MEDICAL CENTER et al., Appellees and Cross-Appellants.

[Cite as *McLeod v. Mt. Sinai Med. Ctr.*, 166 Ohio App.3d 647, 2006-Ohio-2206.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 85286, 85574 and 85605.

Decided May 4, 2006.

648

650

Jack Beam and Douglas J. Raymond; Geoffrey N. Fieger and Jeremiah J. Kenney; Sandra J. Rosenthal; and Muth & Shapiro, P.C., and Andrew S. Muth, for appellant and cross-appellee.

Reminger & Reminger Co., L.P.A., Marc W. Groedel, Marilena DiSilvio, and W. Bradford Longbrake; Tucker, Ellis & West, L.L.P., and Irene C. Keyse–Walker; Meckler, Bulger & Tilson, L.L.P., and Michael M. Marick; and Hammond, Sewards & Williams and Scott E. Williams, for appellee and cross-appellant Mt. Sinai Hospital Medical Center.

Jones Day, Pearson N. Bownas, Mark Herrmann, and Mary Beth Young; and Sutter, O'Connell, Mannion & Farchione, Joseph A. Farchione, Thomas H. Terry III, John V. Jackson, and Edward Blakemore, for appellees and cross-appellants Ronald Jordan, M.D., and Northeast Ohio Neighborhood Health Services, Inc.

FRANK D. CELEBREZZE JR., Presiding Judge.

{¶ 1} Plaintiff-appellant and cross-appellee, Mark A. McLeod ("plaintiff" or "McLeod"), guardian of the estate of Walter Hollins, initiates this appeal to reinstate the original jury verdict and award in this medical malpractice lawsuit. After a thorough review of the record and the arguments of the parties, we ultimately reverse the trial court's order granting a new trial and remand the matter for consideration of remittitur of damages and prejudgment interest.

{¶ 2} This medical malpractice action stems from the events surrounding the birth of Walter Hollins ("Hollins"). On January 29, 1987, Hollins was born via Caesarean section at the former Mt. Sinai Hospital in Cleveland. Hollins, an intrauterine growth retarded ("IUGR") baby, was born with the lifelong debilitating conditions of cerebral palsy and severe retardation. At the time of Hollins's birth, a Caesarean section was ordered because of fetal distress. Once the procedure was ordered, it took approximately two hours to deliver baby Hollins. The record also indicates that Hollins experienced some degree of asphyxia at birth.

{¶ 3} In 1998, plaintiff filed suit alleging medically negligent prenatal and postnatal care resulting in Hollins's condition. The complaint was specifically brought against Dr. Ronald Jordan, the physician who performed the Caesarean section, and his employer, Northeast Ohio Neighborhood Health Services, Inc. The complaint also included codefendant Mt. Sinai Hospital, the facility where the Caesarean section took place. In addition, the complaint included a claim of spoliation of medical records.

{¶ 4} The case was originally assigned to the regular common pleas docket but was eventually reassigned to a visiting judge. A jury trial began on May 4, 2004, with causation of Hollins's infirmities at the core of the contested issues. While plaintiff maintained that Hollins's condition was a direct result of medical malpractice, the defense attributed causation to placental insufficiency throughout Hollins's development in utero and through no fault of medical treatment.

{¶ 5} On May 24, 2004, the jury returned a verdict for the plaintiff and entered an award of $30 million—$15 million in economic damages and $15 million in noneconomic damages.

{¶ 6} In response, the defense filed motions for judgment notwithstanding the verdict ("JNOV"), for a new trial or, in the alternative, for remittitur. In August 2004, the trial court granted defendants' motion for a new trial. On September 8, 2004, plaintiff filed an affidavit of disqualification of the visiting judge, followed by a Civ.R. 60(B) motion for relief from order. The visiting judge subsequently recused himself.

{¶ 7} On September 20, 2004, a hearing was held before a newly assigned common pleas judge on plaintiff's Civ.R. 60(B) motion for relief. Prior to a ruling, plaintiff filed an appeal challenging the granting of a new trial. Cross-appeals were also filed. This court remanded the matter for a ruling on the pending Civ.R. 60(B) motion for relief. On November 19, 2004, the lower court granted plaintiff's motion for relief and ordered the jury verdict and award reinstated.

{¶ 8} Defendants subsequently filed notices of appeal from the granting of plaintiff's Civ.R. 60(B) motion for relief. All three appeals have been consolidated and will be disposed of by this opinion.[1]

{¶ 9} There are two main issues in this appeal: (1) should the lower court have granted plaintiff's Civ.R. 60(B) motion for relief, and, if not, (2) should the trial court's order for a new trial be upheld? The remaining issues to be addressed include (1) Mt. Sinai's cross-appeal of the trial court's denial of their motions for directed verdict and JNOV, (2) the directed verdict against plaintiff's claims of

---

1. See Appendix for the specific assignments of error cited in the appeal and cross-appeals.

spoliation and/or punitive damages, and (3) plaintiff's motion for prejudgment interest. We will address each issue accordingly.

## THE GRANTING OF PLAINTIFF'S RULE 60(B) MOTION

{¶ 10} Civ.R. 60(B) reads:

{¶ 11} "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: * * * (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; * * * or (5) any other reason justifying relief from the judgment."

{¶ 12} To prevail on a motion under Civ.R. 60(B), the movant must demonstrate that (1) the party has a meritorious defense or claim to present if relief is granted, (2) the party is entitled to relief under one of the grounds stated in Civ.R. 60(B)(1) through (5), and (3) the motion is made within a reasonable time, and, where the grounds of relief are Civ.R. 60(B)(1), (2) or (3), not more than one year after the judgment, order, or proceeding was entered or taken. *GTE Automatic Elec. v. ARC Industries* (1976), 47 Ohio St.2d 146, 1 O.O.3d 86, 351 N.E.2d 113, paragraph two of the syllabus.

{¶ 13} In granting the Civ.R. 60(B) motion for relief, the lower court articulated its fundamental disagreement with the trial court's granting of a new trial. The lower court argued that the trial court improperly substituted its opinion for the findings of the jury in ordering a new trial. Therefore, the lower court overruled the order for a new trial by granting plaintiff's Civ.R. 60(B) motion for relief. Ordinarily "a motion for relief from judgment under Civ.R. 60(B) is discretionary with the trial court; and, in the absence of a clear showing of abuse of discretion, the trial court's decision should not be disturbed on appeal." *Wiley v. Natl. Garages, Inc.* (1984), 22 Ohio App.3d 57, 22 OBR 153, 488 N.E.2d 915.

{¶ 14} However, this court has further held that a Civ.R. 60(B) motion may not be used as a substitute for a direct appeal. *Manigault v. Ford Motor Co.* (1999), 134 Ohio App.3d 402, 731 N.E.2d 236, citing *Doe v. Trumbull Cty. Children Servs. Bd.* (1986), 28 Ohio St.3d 128, 28 OBR 225, 502 N.E.2d 605; *Natl. Amusements, Inc. v. Springdale* (1990), 53 Ohio St.3d 60, 63, 558 N.E.2d 1178; *Justice v. Lutheran Social Servs. of Cent. Ohio* (1992), 79 Ohio App.3d 439, 442, 607 N.E.2d 537. "Civ.R. 60(B) is not a viable means to attack legal errors made by a trial court; rather, it permits a court to grant relief when the factual circumstances relating to a judgment are shown to be materially different from the circumstances at the time of the judgment. See, *Kay v. Marc Glassman, Inc.* (Feb. 1, 1995), Summit App. No. 16726 [1995 WL 39393], unreported * * *.

Civ.R. 60(B) relief * * * thus cannot be used to challenge the correctness of the trial court's decision on the merits." *Anderson v. Garrick* (Oct. 12, 1995), Cuyahoga App. No. 68244, 1995 WL 601096.

{¶ 15} Our review now becomes de novo: "Although the trial court's ruling on a Civ.R. 60(B) motion is usually subject to an abuse of discretion standard of review, we conclude that overruling a Civ. R. 60(B) motion for the reason that it is improperly used as a substitute for appeal presents an issue of law." *Ford Motor Credit Co. v. Cunningham,* Montgomery App. No. 20341, 2004-Ohio-6226, 2004 WL 2659177.

{¶ 16} We find plaintiff's Civ.R. 60(B) motion for relief in this case to be an improper attempt at an appeal. A comparison of the arguments raised by plaintiff in opposition to the motion for a new trial and those made in support of the motion for 60(B) relief shows that they are nearly identical. This illustrates that a direct appeal was the appropriate forum to reassert plaintiff's contentions, rather than a motion for relief. Furthermore, the lower court's granting of Civ.R. 60(B) relief was based upon a determination that the order for a new trial was incorrect on the merits. The opinion and order granting Civ.R. 60(B) relief is completely void of any citation to extraordinary circumstances that would justify the granting of Civ.R. 60(B) relief. We, therefore, vacate the granting of plaintiff's Civ.R. 60(B) motion.

## THE GRANTING OF THE DEFENSE'S MOTION FOR A NEW TRIAL

{¶ 17} With the lower court's order for relief vacated, we now turn to the trial court's order for a new trial, which stated:

{¶ 18} "Civil Rule 59(A) permits the granting of a new trial upon various grounds, including the following, which do apply in this case:

{¶ 19} "Irregularity in the proceedings * * * by which an aggrieved party was prevented from having a fair trial.

{¶ 20} "Misconduct of the jury or prevailing party.

{¶ 21} "Accident or surprise which ordinarily prudence could not have guarded against.

{¶ 22} "Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice.

{¶ 23} "Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.

{¶ 24} "In addition, a new trial may also be granted in the sound discretion of the court for good cause shown.

{¶ 25} "The Court believes that the major grounds for relief set forth by Defendants are (1) the award of excessive damages given under the influence of passion and prejudice, (2) the misconduct of Plaintiff's counsel throughout the trial, and (3) irregularity in the proceedings which prevented a fair trial."

{¶ 26} Through its journal entry, the trial court attempts to explain its reasons for granting a new trial, finding that the award was excessive and due to a passion-influenced jury, that plaintiff's trial attorney displayed continuous misconduct throughout the trial, and that there was irregularity in the proceedings due to the court's handling of a newspaper article that potentially could have influenced the jury.

{¶ 27} A reviewing court may reverse a trial court if it abused its discretion in ordering a new trial. *Antal v. Olde Worlde Products* (1984), 9 Ohio St.3d 144, 145, 9 OBR 392, 459 N.E.2d 223. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140. The high abuse-of-discretion standard defers to the trial court because the trial court's ruling may require an evaluation of witness credibility that is not apparent from the trial transcript and record. *Schlundt v. Wank* (Apr. 17, 1997), Cuyahoga App. No. 70978, 1997 WL 186830. However, so long as the verdict is supported by substantial, competent, credible evidence, the jury verdict is presumed to be correct and the trial court must refrain from granting a new trial. Id.

{¶ 28} This court finds that the jury verdict in this case was supported by substantial, competent, credible evidence; thus, we find error in the trial court's decision to order a new trial. The defense did not contest liability in this appeal, focusing instead on the amount of damages awarded. No assignment of error was raised with respect to liability on cross-appeal. In proving economic damages, plaintiff presented expert testimony giving differing estimates of health care that could be calculated to a range of total damages. The figure for noneconomic damages is also debatable. Thus, while the damage award may be the subject of debate, the record substantially supports plaintiff's argument that the trial court abused its discretion in granting a new trial by impairing the traditional function of the jury, substituting its own opinion in place of the jury, and traveling outside of the record to substitute its own opinions when it could find no proper support in the record.

{¶ 29} The trial court cites to irregularities in the proceedings in justifying its ruling; however, the flaws cited by the trial court in making its determination do not support the order of a new trial. While the trial court engaged in an ex parte discussion with defense counsel about a Plain Dealer newspaper article and

engaged in ex parte communications with the jury, these irregularities were not even objected to by the plaintiff. To grant a new trial on this basis would be to reward a claimed error that was initiated by defense counsel. Moreover, there is no reasonable basis to conclude that these irregularities had a prejudicial effect on the outcome of the trial.

. **[9]** {¶ 30} The trial court also claimed that the conduct by plaintiff's counsel was improper and inflammatory and thus warranted a new trial. There is nothing that prohibits counsel from being zealous in their representation. Further, trial counsel should be accorded wide latitude in opening and closing arguments. *Presley v. Hammack*, Jefferson App. No. 02 JE 28, 2003-Ohio-3280, 2003 WL 21448228. Here, defense counsel did not even object to the claimed improper comments in plaintiff's closing. In addition, defense counsel made its own questionable comments in the proceedings, including personal attacks.

{¶ 31} Only " '[w]here gross and abusive conduct occurs, is the trial court bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.' " (Emphasis omitted.) *Pesek v. Univ. Neurologists Assn., Inc.* (2000), 87 Ohio St.3d 495, 501, 721 N.E.2d 1011, quoting *Snyder v. Stanford* (1968), 15 Ohio St.2d 31, 37, 44 O.O.2d 18, 238 N.E.2d 563. Moreover, counsel's behavior has to be of such a reprehensible and heinous nature that it constitutes prejudice before a court can reverse a judgment because of the behavior. *Hunt v. Crossroads Psych. & Psychological Ctr.* (Dec. 6, 2001), Cuyahoga App. No. 79120, 2001 WL 1558574, citing *Kubiszak v. Rini's Supermarket* (1991), 77 Ohio App.3d 679, 688, 603 N.E.2d 308.

{¶ 32} In this case, while the remarks by counsel may have been questionable, they were not so outrageous as to warrant a new trial. Again, there was sufficient evidence to support the jury's verdict. Much of the evidence was not rebutted. Further, there is no challenge in this appeal to the jury's finding of liability. Under these circumstances, we find it to be an abuse of discretion to grant a new trial.

{¶ 33} It does appear, however, that the jury's damages award is subject to remittitur. Granting a remittitur is different from granting a new trial. When a damages award is manifestly excessive, but not the result of passion or prejudice, a court has the inherent authority to remit the award to an amount supported by the weight of the evidence. *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 444, 715 N.E.2d 546. Four criteria are necessary for a court to order a remittitur: "(1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages." *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d

121, ¶ 184, citing *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus. Remittitur plays an important role in judicial economy by encouraging an end to litigation rather than a new trial. While an appellate court has the power to order a remittitur, the trial court is in the best position to determine whether a damages award is excessive. *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 654–655, 635 N.E.2d 331. If the prevailing party refuses to accept the remittitur, then the court must order a new trial. *Burke v. Athens* (1997), 123 Ohio App.3d 98, 102, 703 N.E.2d 804.

{¶ 34} In this case, the record reflects that expert testimony was introduced that was based on "assumptions" and went beyond the calculations provided in the expert reports. Plaintiff does not contest that the maximum amount of economic damages stipulated and admitted into evidence was $12,637,339. Defense counsel raises several objections to the amount of the economic-damages award. It also appears that the jury's award of noneconomic damages was influenced by the amount of the economic award, both awards being $15,000,000. Accordingly, we remand the matter to the trial court for consideration of the motion for remittitur.

{¶ 35} The dissenting opinion takes exception with our ruling on this assignment of error. While it agrees that granting a new trial is not warranted by the cited irregularities, the dissent argues that the trial court's order should be affirmed because of the excessive damage award and plaintiff's attorney's misconduct. While we agree that plaintiff's attorney does not appear in the transcript to be the most likeable person, we do not find that his conduct rises to the level to justify the granting of a new trial.

{¶ 36} In the end, though, the jury—the body that our system of justice entrusts as the finder of fact—heard all the evidence and arguments and found the defendants professionally negligent. We find nothing in the record that would lead us to hold that finding to be a product of passion or prejudice.

{¶ 37} As to the dissent's concern of excessive damages, any such concern will be best addressed in this court's remand for remittitur. Again, liability was not the focus of the defense's appeal before this court. Their arguments were specific to the amount of damages awarded. Therefore, we find that any concern as to excessive damages will be adequately addressed through remittitur.

## MT. SINAI'S CROSS–APPEAL

{¶ 38} Mt. Sinai was named a codefendant in this action because of alleged negligence by the hospital's employees and/or agents. Dr. Hatoum, the agent specified in this appeal, was an independent-contractor anesthesiologist on staff at Mt. Sinai the day of Hollins's birth. The jury ultimately found Mt. Sinai liable

to plaintiff. Mt. Sinai now cross-appeals the denial of its motions for directed verdict and JNOV, arguing that Dr. Ḥatoum was an independent contractor, and thus the hospital cannot be rendered vicariously liable.

{¶ 39} "The applicable standard of review to appellate challenges to the overruling of motions for judgment notwithstanding the verdict is identical to that applicable to motions for a directed verdict." *Posin v. ABC Motor Court Hotel* (1976), 45 Ohio St.2d 271, 74 O.O.2d 427, 344 N.E.2d 334; *McKenney v. Hillside Dairy Co.* (1996), 109 Ohio App.3d 164, 176, 671 N.E.2d 1291. Such review is de novo. *Goodyear Tire & Rubber v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835.

{¶ 40} A motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence. *Brooks v. Brost Foundry Co.* (May 3, 1991), Cuyahoga App. No. 58065, 1991 WL 69341. " 'A review of the trial court's denial of appellant's motion for a directed verdict and motion for judgment notwithstanding the verdict requires a preliminary analysis of the components of the action * * *.' *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 13, 531 N.E.2d 333, 337." *Star Bank Natl. Assn. v. Cirrocumulus Ltd. Partnership* (1997), 121 Ohio App.3d 731, 742–743, 700 N.E.2d 918, citing *McKenney*, 109 Ohio App.3d at 176, 671 N.E.2d 1291; *Pariseau v. Wedge Products, Inc.* (1988), 36 Ohio St.3d 124, 127, 522 N.E.2d 511.

{¶ 41} A motion for judgment notwithstanding the verdict, as well as for a directed verdict, should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential elements of the claim. *Posin,* supra, at 275, 74 O.O.2d 427, 344 N.E.2d 334. Conversely, the motion should be granted where the evidence is legally insufficient to support the verdict. Id.

{¶ 42} In *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 539 N.E.2d 1114, the court wrote: "The test for granting a directed verdict or judgment n.o.v. is whether the movant is entitled to judgment as a matter of law when the evidence is construed most strongly in favor of the non-movant." Id. at 172, 539 N.E.2d 1114.

{¶ 43} Regardless of claims made concerning Dr. Hatoum, it is clear that Mt. Sinai's motions were properly denied. In general, an employer is vicariously liable for the torts of its employees. *Clark v. Southview Hosp.* (1994), 68 Ohio St.3d 435, 628 N.E.2d 46. In its case against Mt. Sinai, plaintiff cites negligence on the part of the nursing staff and other staff members, apart from Dr. Hatoum, that resulted in plaintiff's injuries. Furthermore, in finding Mt. Sinai liable, the jury gave the following answer to the pertinent interrogatory:

{¶ 44} "Mt. Sinai staff did not expedite an urgent C-section, did not properly monitor the fetus during a critical time. As a result of the delay neurological damage occurred."

{¶ 45} This finding clearly demonstrates that the issue of Mt. Sinai's liability includes its employees and that reasonable minds can come to differing conclusions as to their liability. Thus, Mt. Sinai should not have been dismissed from this litigation pursuant to either a directed verdict or JNOV.

{¶ 46} As to Mt. Sinai's liability for the actions of Dr. Hatoum, the law of vicarious liability controls. The traditional test for determining a hospital's vicarious liability in this situation is stated in *Clark*, supra:

{¶ 47} "A hospital may be held liable under the doctrine of agency by estoppel for the negligence of independent medical practitioners practicing in the hospital if it holds itself out to the public as a provider of medical services and in the absence of notice or knowledge to the contrary, the patient looks to the hospital, as opposed to the individual practitioner, to provide competent medical care. * * * Unless the patient merely viewed the hospital as the situs where her physician would treat her, she had a right to assume and expect that the treatment was being rendered through hospital employees and that any negligence associated therewith would render the hospital liable. Id., 68 Ohio St.3d at 444–445, 628 N.E.2d 46.

{¶ 48} In considering the doctrine of agency by estoppel as applied to hospitals, the "critical question is whether the plaintiff, at the time of his admission to the hospital, was looking to the hospital for treatment of his physical ailments or merely viewed the hospital as the situs where his physician would treat him for his problems * * *." Id. at 439, 628 N.E.2d 46.

{¶ 49} Mt. Sinai's appeal emphasizes that the plaintiff did not specifically name Dr. Hatoum in his amended complaint, nor was he joined after the trial court's entry requiring the joinder of necessary parties under Civ.R. 19. The Ohio Supreme Court has recently held that because agency by estoppel is a derivative claim of vicarious liability, there can be no viable claim against a hospital for agency by estoppel based on the alleged negligence of an independent-contractor physician as to whom the statute of limitations has expired. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712. Mt. Sinai now argues that *Comer* requires this court to sustain its appeal. We disagree.

{¶ 50} Credible arguments were presented by both parties as to whether plaintiff triggered the doctrine of agency by estoppel by looking to the hospital for treatment. Since reasonable minds could still differ as to a conclusion, it is the duty of the court to send the issue to the jury. *Fraysure v. A Best Prods. Co.*, Cuyahoga App. No. 83017, 2003-Ohio-6882, 2003 WL 22971024. Mt. Sinai's

motions for directed verdict and JNOV were properly denied; therefore, we affirm the trial court on this issue.

## SPOLIATION AND/OR PUNITIVE DAMAGES

{¶ 51} At the close of plaintiff's case, the trial court ruled in favor of the defense on plaintiff's motion for directed verdict on the claim of spoliation, which involved missing medical records. A motion for directed verdict is to be granted when, construing the evidence most strongly in favor of the party opposing the motion, the trial court finds that reasonable minds could come to only one conclusion, and that conclusion is adverse to such party. Civ.R. 50(A)(4); *Crawford v. Halkovics* (1982), 1 Ohio St.3d 184, 1 OBR 213, 438 N.E.2d 890; *The Limited Stores, Inc. v. Pan Am. World Airways, Inc.* (1992), 65 Ohio St.3d 66, 600 N.E.2d 1027.

{¶ 52} A directed verdict is appropriate where the party opposing it has failed to adduce any evidence on the essential elements of his claim. *Cooper v. Grace Baptist Church* (1992), 81 Ohio App.3d 728, 734, 612 N.E.2d 357. The issue to be determined involves a test of the legal sufficiency of the evidence to allow the case to proceed to the jury, and it constitutes a question of law, not one of fact. *Hargrove v. Tanner* (1990), 66 Ohio App.3d 693, 695, 586 N.E.2d 141; *Vosgerichian v. Mancini Shah & Assoc.* (Feb. 29, 1996), Cuyahoga App. Nos. 68931 and 68943, 1996 WL 86684. Accordingly, the courts are testing the legal sufficiency of the evidence rather than its weight or the credibility of the witnesses. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68–69, 23 O.O.3d 115, 430 N.E.2d 935.

{¶ 53} Since a directed verdict presents a question of law, an appellate court conducts a de novo review of the lower's court judgment. *Howell v. Dayton Power & Light Co.* (1995), 102 Ohio App.3d 6, 13, 656 N.E.2d 957; *Keeton v. Telemedia Co. of S. Ohio* (1994), 98 Ohio App.3d 405, 409, 648 N.E.2d 856.

{¶ 54} The spoliation claim alleged misconduct regarding certain missing medical records. "[T]he elements of a claim for interference with or destruction of evidence are (1) pending or probable litigation involving the plaintiff, (2) knowledge by the defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts * * *." *Smith v. Howard Johnson Co.* (1993), 67 Ohio St.3d 28, 29, 615 N.E.2d 1037.

{¶ 55} Plaintiff has offered no evidence that any of the records at issue were missing because of "willful destruction * * * designed to disrupt the plaintiff's case." Plaintiff's argument is based on innuendo, claiming that the records were

missing "without explanation." Nowhere in plaintiff's argument is there any evidence of willful destruction by the defense. Furthermore, the records at issue were of Hollins's birth in 1987, 11 years before a suit was ever filed. Mt. Sinai Medical Center has since closed, which event clearly had a negative effect on any record keeping. Plaintiff cannot maintain this claim, and we affirm the trial court's directed verdict.

## PREJUDGMENT INTEREST

{¶ 56} Finally, when the trial court granted the motion for a new trial, plaintiff's motion for prejudgment interest was held to be moot. In reversing the order for new trial, we now also reverse the ruling finding the motion for prejudgment interest to be moot. As we remand this matter for consideration of remittitur, we also direct the trial court to make appropriate determinations in consideration of plaintiff's motion for prejudgment interest.

{¶ 57} This court hereby vacates the lower court's granting of plaintiff's Civ.R. 60(B) motion for relief. We further affirm the trial court's denials of Mt. Sinai's motions for directed verdict and judgment notwithstanding the verdict, and affirm the trial court's directed verdict in favor of the defense on the claim of spoliation. However, we reverse the trial court's order for a new trial and remand the matter for consideration of the motion for remittitur of damages and plaintiff's motion for prejudgment interest.

> Judgment affirmed in part,
> vacated in part,
> reversed in part,
> and cause remanded.

GALLAGHER, J., concurs.

KARPINSKI, J., concurs in part and dissents in part.

KARPINSKI, Judge, concurring in part and dissenting in part.

{¶ 58} I concur in part and respectfully dissent in part with the majority opinion. I disagree with the majority solely on the issue of whether the order for a new trial should be vacated. I agree that a new trial is not warranted solely by the "irregularity in the proceedings" the trial court partially relied on, that is, the court's failure to voir dire the jury after it spoke to several jury members about a newspaper article discussing the case. I find, however, that the court's remaining reasons, excessive damages and attorney misconduct, justify an order for a new trial.

{¶ 59} A trial court's decision granting a new trial is reviewed under the abuse-of-discretion standard. The majority relies on *Schlundt v. Wank* (Apr. 17, 1997), Cuyahoga App. No. 70978, 1997 WL 186830. In *Schlundt,* the trial court had not provided any reasons for its decision to grant a new trial. In contrast, the court in the case at bar issued a detailed 13-page judgment entry explaining its reasoning. The Twelfth Appellate District has emphasized the abuse-of-discretion standard, especially regarding questions of fact:

"Where a trial court is authorized to grant a new trial for a reason which requires the exercise of a sound discretion, the order granting a new trial may be reversed only upon a showing of abuse of discretion by the trial court." (Footnote omitted.) *Antal v. Olde Worlde Products, Inc.* (1984), 9 Ohio St.3d 144, 145, 9 OBR 392, 393, 459 N.E.2d 223, 225. * * *. Moreover, when the trial court's decision concerns questions of fact, the generally accepted rule is that a *reviewing court "should view the evidence favorably to the trial court's action rather than to the * * * jury's verdict." Rohde* [*v. Farmer* (1970) ], supra, 23 Ohio St.2d [82] at 94, 52 O.O.2d [376] at 382, 262 N.E.2d [685] at 692.

(Emphasis added.) *Tobler v. Hannon* (1995), 105 Ohio App.3d 128, 130, 663 N.E.2d 732.

{¶ 60} I believe the record demonstrates that the trial judge did not abuse his discretion in granting a new trial.

{¶ 61} The granting of a new trial is governed by Civ.R. 59, which states:

(A) Grounds.—A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

(1) *Irregularity in the proceedings of* the court, jury, magistrate, or *prevailing party,* or any order of the court or magistrate, or abuse of discretion, *by which an aggrieved party was prevented from having a fair trial;*

(2) *Misconduct of* the jury or *prevailing party;*

* * *

(4) *Excessive* or inadequate *damages, appearing to have been given under the influence of passion or prejudice;*

* * *

(9) *Error of law* occurring at the trial and *brought to the attention of the trial court* by the party making the application.

In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown.

When a new trial is granted, the court shall specify in writing the grounds upon which such new trial is granted.

(Emphasis added.) In its order, the trial court listed three reasons for granting a new trial: an excessive award of damages given under the influence of passion and prejudice, the misconduct of plaintiff's counsel through the duration of the

trial, and irregularity in the proceedings which prevented a fair trial. Because I agree with the majority that the alleged irregularity concerning the newspaper article does not justify a new trial, I will restrict my discussion to the first two reasons, each adequate in its own right to justify a new trial.

## EXCESSIVE DAMAGES

{¶ 62} In its judgment entry granting a new trial, the court points to the testimony of the economic expert, Harvey Rosen, Ph.D. An expert's testimony is limited by Loc.R. 21.1(B), which states: "An expert will not be permitted to testify or provide opinions on issues not raised in his report." The purpose of limiting experts to the opinions contained in their reports is to prevent unfair "ambush" of the other side. *O'Connor v. Cleveland Clinic Found.*, 161 Ohio App.3d 43, 2005-Ohio-2328, 829 N.E.2d 350, ¶ 18, citing *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d 367, 370–371, 28 OBR 429, 504 N.E.2d 44.

{¶ 63} Harvey Rosen's expert report had estimated that the expenses for Walter for the duration of his life expectancy would be between $4,303,088 and $6,413,639. This estimate was based, in part, on the wages of a home-health-care aide, a person trained to be an assistant to help Walter 24 hours a day with his activities of daily living, including eating, hygiene care, and transfer from chair to bed and back.

{¶ 64} At trial, however, the court erroneously allowed Harvey Rosen to testify to the cost of providing Walter with round-the-clock care by a registered nurse. Nowhere during the trial, however, did plaintiff present *any* evidence that Walter would need or benefit from 24–hour care by an R.N., as opposed to care by a trained home-health aide. Defense counsel objected to this testimony, but, as it admits in its judgment entry, the court erred in failing to sustain those objections or to hold a side bar to discuss them. As a result of this admitted error by the trial court, Harvey Rosen testified to an amount of money three times the actual amount contained in his report. Permitting this expert to testify to sums which were neither contained in his report nor ever justified by any evidence was a grave abuse of discretion on the part of the trial court. As defendants explained in their appellate brief, they did not hire an independent economic expert or life-care planner because they did not disagree with the reports of Mr. Fieger's experts and relied on the limitation of costs those reports described. Thus the jury was left with a cost inflated beyond what the evidence justified and, more important, without any expert testimony to attack its excessiveness.[2]

---

2. {¶ a} Nor was Harvey Rosen the only expert who was permitted to testify inappropriately. Several of plaintiff's expert witnesses testified, despite defendants' objections, to opinions outside their areas of expertise, areas for which they had not been qualified as experts.

{¶ 65} Even more disturbing is the testimony of Dr. Gabriel, a pediatric neurologist, concerning the cost of care that Walter would need throughout his life. Despite multiple objections upon which the court failed to rule, the witness proceeded to testify with specific monetary figures for various types of care. This testimony was clearly outside the scope of the pediatric neurologist's area of expertise, and again was prejudicial to defendant's case because the testimony reinforced the economic expert's inflated economic figures. The defendants did not present an economic expert or a life-care planner in their case in chief because they did not disagree with the reports of plaintiff's experts. They were ambushed, therefore, when the court permitted testimony that exceeded the amounts contained in Harvey Rosen's report and, in the case of Dr. Gabriel, that was not within the expert's area of expertise at all.

{¶ 66} The trial court was correct in concluding that these errors led to the jury's award of excessive damages.

## LIABILITY

{¶ 67} Much of defendant's discussion of specific parts of the trial, although subsumed under the category of attorney misconduct, go to the question of liability.

---

{¶ b} This inappropriate use of experts, although objected to by defense counsel, was permitted throughout plaintiff's case in chief. For example, a maternal-fetal medicine expert was permitted to testify about the standard of care for nurses, even though she admitted on cross-examination that she usually encourages attorneys to retain a nursing expert to testify on the nursing standards. The neonatologist was permitted to testify concerning the standards for an obstetrician as well as clinical signs, like the amount of amniotic fluid and its effect on fetal hypoxia. He admitted on cross-examination that he did not have enough knowledge to comment on this area. Defense counsel also objected that the neonatologist examined Walter for the first time on the morning of trial yet was permitted to testify about Walter's condition.

{¶ c} Dr. Gabriel, an expert in pediatric neurology, was permitted to testify about obstetrical matters, even though he admitted he was not an obstetrician, when he testified about the definition of "fetal distress." The court overruled a defense objection. He was also permitted to testify to the appropriateness of removing a fetal monitor from the mother. When defense counsel objected, noting that the question pertained to the standard of care (by the nurses and obstetrician), an area outside the pediatric neurologist's expertise, the trial court permitted the doctor to answer the question. The pediatric neurologist responded that there was no medical reason for removing the fetal monitor from the mother prior to the Caesarean section. This testimony enhanced the credibility of plaintiff's theory that defendants had failed to monitor the mother properly. Although on cross-examination Dr. Gabriel admitted that he was not qualified to testify to the standard of care, the opinion was already before the jury. Similarly, the neuroradiologist testified that he would leave it to the other experts to pinpoint the time at which Walter's brain injury occurred. Mr. Fieger nonetheless asked him, over defense objection, whether he agreed with the reports of the other experts. The neuroradiologist stated that he had no disagreement with the other experts' reports.

{¶ d} Plaintiff's obstetrical expert was permitted to testify concerning the nursing standard of care. And the plaintiff's anesthesia expert was permitted to testify concerning the obstetrical standard of care.

{¶ 68} I note the majority states that "[t]he defense did not contest liability in this appeal, focusing instead on the amount of damages awarded." Although it is true that defendants predominantly focused on the damages award in their appellate brief, it is inaccurate to say they did not contest liability. Defendants did indeed raise the liability issue, both in their statement of issues and in their discussion in their brief. In their statement of issues, they noted that "[t]he medical experts were diametrically opposed and the jury verdict was split on liability."

{¶ 69} More specifically, in their statement of facts, defendants dispute the underlying liability issue. For three pages they discuss the evidence presented by their expert witnesses that Walter's injuries occurred in a time period well before birth. Those experts explained that Walter's brain injury resulted from "placental insufficiency, which caused chronic oxygen deprivation and retarded growth throughout the course of the pregnancy." Defendants argue, therefore, that Walter's intrauterine growth retardation and microcephaly, which started many weeks before birth and was a result of the placental insufficiency, was the primary cause of Walter's brain damage. Defendants further explain that the experts testified that "[t]he injuries associated with [Walter's] microcephaly would not be evidenced on an ultrasound, CAT scan, or MRI."

{¶ 70} When discussing the remedy, defendants again referred to these liability issues. They argued that "Judge Lawther noted that other new trial grounds asserted by Defendants, 'especially with respect to the issues of negligence and proximate cause,' have merit." After this discussion of liability issue, defendants expressly requested that if this court did not agree with the order for a new trial because of attorney misconduct, "it should remand this case so the Trial Court can fully consider those additional grounds."

## MISCONDUCT OF PLAINTIFF'S COUNSEL

{¶ 71} A second reason the trial court points to in its judgment entry granting a new trial is the behavior of plaintiff's counsel, Mr. Fieger. The court notes Mr. Fieger's "theatrical and discourteous demeanor throughout the trial," his failure to follow court procedure in entering objections, and his "trial technique which was designed to manipulate and mislead the jury." A review of the entire 2,400-page transcript compels agreement with the court's description. Excerpts from the transcript demonstrate counsel's egregious behavior and contradictory and argumentative questioning. One example of his manipulative trial technique was his misleading restatement of witnesses' testimony in his follow up questions. This technique was especially discernable when he discussed several key phrases: "emergency Caesarean section" and "fetal distress."

{¶ 72} Several experts testified that the term "fetal distress" is ambiguous and vague, because it can cover a wide range of conditions, from life threatening, requiring immediate Caesarean delivery, to merely significant heart rate changes, requiring close observation and expedient, but not immediate, Caesarean delivery. Despite the agreement on the dual meaning of the term, Mr. Fieger persisted in choosing only one meaning: a fetus near death, "practically dead," as he often said during the trial.

{¶ 73} Mr. Fieger also took liberties with the definitions of "emergency." In answering his questions, all who had worked on the case were in accord in explaining that there were two categories of C-section: scheduled and emergency. An emergency Caesarean section simply means one which was not previously scheduled. The witnesses explained that there was a significant difference between an ordinary emergency case and a "stat" or "crash" case. In an ordinary "emergency" C-section, the doctor determines the mother would not be able to safely deliver the child vaginally and therefore the child would have to be delivered by C-section before she went into labor. A "stat" or "crash" case, on the other hand, according to the testimony of all the nonexpert witnesses, as well as most of the expert witnesses, required immediate delivery, without sterile precautions, within 15 minutes to one-half hour.

{¶ 74} Mr. Fieger questioned the witnesses who had been present for Walter's C-section about their care of the mother before delivery. Both Dr. Jordan and the nurses testified that after assessing the mother's and fetus's capacity for vaginal delivery, *before* she was in labor, they determined she would need to be delivered by Caesarean section. They based this assessment on several tests which monitored the baby's heart rate in response to various situations: with the mother at rest, with the mother repositioned to relieve pressure on her vena cava and therefore to increase blood flow to the placenta, and with the mother receiving minimal doses of Pitocin, a test that gives very small doses of a drug which stimulates the uterus to contract. All these tests showed that the baby's heart rate was within the normal range without stress; the tests also showed that any stress, such as a contraction, caused potentially dangerous changes in its heart rate. The tests also further showed that the baby's heart rate did not vary to the degree that a normal baby's would.

{¶ 75} It is undisputed that the baby was "intrauterine growth retarded," meaning that in dealing with the stress of vaginal delivery it would not have the reserves of a normal sized baby. All the staff members of Mt. Sinai, including Dr. Jordan, the obstetrician who delivered Walter, agreed on the conditions of the mother and the baby, as well as on the meaning of the terms they used. They agreed that the baby needed to be delivered within the day, but not necessarily within the hour. All the witnesses in this case were forced to draw their

conclusions from the medical chart. The staff members who cared for the mother and Walter all concurred as to the terminology, methodology, and procedures in use at Mt. Sinai in 1987. This agreement was highlighted by the agreement of all the defense fact witnesses that they had no specific memory of this particular birth, which had occurred 17 years earlier. Nonetheless, despite this consistency in their testimony, Mr. Fieger persisted in mischaracterizing their answers in misleading ways.

{¶ 76} For example, when responding to a question asking why he did not rush to the operating room to give anesthesia for the Caesarean section, the anesthesiologist explained that the case must not have been urgent. The staff "would have told me we need to do a stat C-section and I would have gone and * * * behaved differently" with a stat section. He further tried to explain the system the hospital had in place for notifying the necessary personnel for an unscheduled C-section: "When we receive a page, we call back and they would have told me it is a stat C-section or it is not a stat C-section * * *." Interrupting, Mr. Fieger asked him who had told him that. When the anesthesiologist answered that he did not remember whom he had spoken to or the specific conversation, Mr. Fieger responded, "Are you telling us that you're making up what you don't remember?" The trial court overruled a defense objection.

{¶ 77} Earlier, when the anesthesiologist testified that he did not recall that the baby in the case at bar was in distress, Mr. Fieger responded, "[T]hat's why, as far as you were concerned here, you just took your time in an emergency." Although the trial court sustained a defense objection to this misleading summary, it gave no curative instruction to the jury.

{¶ 78} Mr. Fieger also focused on the loss of time from use of an epidural anesthesia instead of a general anesthesia. When the anesthesiologist tried to explain why he had given the mother an epidural anesthesia, the anesthesia of choice in Caesarean sections, Mr. Fieger accused him of taking too much time to anesthetize the mother. It was not disputed that administering an epidural adds a significant amount of time to the anesthesia time, up to 20 minutes. The anesthesiologist explained that it was up to the obstetrician to decide when the baby was in distress and, therefore, required immediate delivery and the use of general anesthesia.

{¶ 79} Ignoring the limited role of the anesthesiologist in obstetrical matters, Mr. Fieger responded, "So if nobody tells you how important it is and how much that baby is at risk, you do the one that would take longer and therefore possibly hurt a baby who's suffocating, right, if nobody tells you?" Mr. Fieger proceeded to bully the witness, asking, "Why in light of the fact that you knew it was an emergency, why wouldn't you ask somebody what's the emergency here, what's the problem that we're doing this emergency C-section? Why wouldn't you ask?"

The doctor answered that, when the case is presented to him, "[t]he information is given to us that we have to take the baby out right away or not and that's enough information." Mr. Fieger responded saying, "I didn't ask that. That wasn't my question. My question, you indicated already nobody told you. My question to you is why didn't you ask?" When the doctor told him he did not remember, Mr. Fieger said: "So nobody told you, you didn't ask and you used the longest acting anesthetic that you could use, right?"

{¶ 80} Defense counsel objected at this point, saying, "Objection. That's not what he said." The court, however, permitted Mr. Fieger to continue. He said: "Sure. You didn't ask anybody whether time was of the essence. Nobody told you so between the general and the epidural, you used the longer acting anesthetic?" Again, defense counsel objected and explained, "He didn't say that there was no discussion about whether time was of the essence." The court did not sustain the objection. The doctor stated, "I used the safest anesthetic for the mother at that time."

{¶ 81} When the anesthesiologist tried to explain that the department had an established system for determining the urgency of an unscheduled or emergency C-section, Mr. Fieger continually misstated the answers and refused to accept the answers for what they were. Instead, implying that the anesthesiologist had more authority over the obstetrical decisions than the evidence indicated, Mr. Fieger attacked the witness, both in the interchange just described as well as throughout his cross-examination.

{¶ 82} Similarly, when questioning one of the nurses who cared for the mother in the labor and delivery unit, Mr. Fieger used the same technique. The nurse tried to explain the difference between an emergency Caesarean section and a stat one: "a stat C-section is done immediately. Emergency means it's not scheduled." She repeatedly clarified for Mr. Fieger that the department at that time used the word "stat" for an emergency Caesarean section in which the baby had to be delivered immediately and emergency for an unscheduled one. Nonetheless, Mr. Fieger persisted in accusing the nurse of wasting valuable time and implying that she had ignored hospital policy in delaying the delivery.

{¶ 83} Refusing to accept a staff member's explanations of the definition of the term "fetal distress," Mr. Fieger purposely confused the meaning of "emergency" and "fetal distress." Despite her attempt to explain that there are varying levels of fetal distress, Mr. Fieger questioned the first nurse, "Are you saying at Sinai Hospital * * * it was the regular practice of Sinai Hospital and you saw this regularly that * * * when little babies were in fetal distress, you regularly saw doctors call emergency C-sections, but you didn't consider it an emergency that had to be done right away for fetal distress?" She tried to clarify what the doctor meant by an emergency: "A stat C-section is when we got a flat-line

crash, baby is bradycardia [3] with a crash." Mr. Fieger also challenged this nurse's interpretation of the fetal-heart-monitor strips.[4] She tried to explain the difference between this baby's lowered reactivity, as indicated by the fetal-monitor strip she had seen, and a total flat-line reading. She was discussing the strips she had read when Mr. Fieger abruptly asked, "Would there be any reason why doctors would make up a story about a child?" [5]

{¶ 84} Despite the nurse's explanation that the chart did not reflect that Walter's delivery was ordered as a "stat" C-section, Mr. Fieger again asked her the same loaded question: "[W]as it the regular practice there for physicians and the hospital not to do stat C-sections on babies in fetal distress?" The nurse again tried to clarify the difference between a stat C-section and an emergency one. Nonetheless, Mr. Fieger persisted in misstating the testimony and ignoring the copious testimony explaining the differences between "stat" and "emergency."

{¶ 85} Mr. Fieger continued to use the same tactics when questioning the second nurse. He again asked, "I want to know, tell the court and the jury when a baby is in fetal distress, an emergency C-section is called, tell me the rule and regulation of that hospital or any nursing facility that says it's all right to just sit around and wait for a couple of hours." The trial court overruled defense counsel's objection that the question was argumentative. Later Mr. Fieger asked this second nurse, "Did you put two and two together at that time and say, I was looking at a baby who was born severely asphyxiated and I know because I was here that the mother waited two hours for an emergency C-section?" Defense counsel objected, saying that the nurse had already testified that she did not remember this delivery at all. Mr. Fieger also asked this nurse, "Okay. There was nothing here other than the nurses and doctors not getting this mother into the operating room and operating on her. There was nothing that prevented either you or the doctors from getting her a C-section, was there, an unusual event, or the electricity went off or something like that?" Defense counsel objected to "the implication that nurses are responsible for doing the C-section." Mr. Fieger responded, "Excuse me. Judge, that's not—." The court told him, "Don't shout at me. I'm overruling the objection. Go ahead."

{¶ 86} Later in the questioning of this nurse, Mr. Fieger speculated that perhaps the doctor had not been present and had been in a car accident or asleep and that it was the nurse's job to find him. She responded by saying that the

---

**3.** Bradycardia is a low heart rate.

**4.** Fetal monitor strips provide a readout of the fetus's cardiac activity, similar to an EKG for adults.

**5.** Dr. Jordan's office notes had indicated a flat-line reactivity reading. This nurse had never seen Dr. Jordan's office notes or the strip in question.

time frame for the delivery was not unusual. "We don't rush everybody who's having an emergency C-section into the delivery room. There's things to prepare. When they [C-sections] are done in a few minutes, it's like if the heart stopped or—." Mr. Fieger interrupted the nurse at this point, saying, "You keep telling us it's not unusual." The court ordered him to "[l]et her finish." She then explained that certain preparations are necessary for the protection of the mother and child. Mr. Fieger nonetheless continued to ask her whether it was a regular occurrence "[t]o wait two hours for an emergency C-section." She told him that she could not remember any other specific cases.

{¶ 87} He then questioned whether she was not able to remember whether any other case took two hours to begin "because that would be so unusual and unacceptable that other than this case, it never happened, did it?" A defense objection was again overruled, despite counsel's technique of using a quotation to comment improperly on her truthfulness.

{¶ 88} Next, Mr. Fieger attempted to argue with the nurse about what role she had played in the C-section: he told her she scrubbed, she told him she circulated, he again told her she scrubbed, she again told him she circulated.

{¶ 89} Continuing to impugn the integrity of the witness by mischaracterizing the facts, Mr. Fieger asked this second nurse, "Assuming that the baby was born virtually dead, it had to be resuscitated, were you just prepared to sit there and wait until that baby died?" The trial court sustained the two defense objections. It did not, however, give any curative instruction to the jury.

{¶ 90} This second nurse tried to explain that if the staff moved too quickly in a case like this mother's, it would put the mother and child at risk of infection and other complications. On cross-examination, defense counsel asked this second nurse whether this mother would have been the only woman in the labor and delivery unit. She responded that there probably were other mothers there at the time. Defense counsel then asked, "[I]f this was indeed something that needed to be done in ten minutes or less, then she would be treated as if she was the only patient?" Before the nurse could respond, Mr. Fieger interjected, "Excuse me. We're talking about—." The court stated, "One at a time." Mr. Fieger said, "Objection. He's asking her to be the doctor now." In a most revealing observation, the court told him, "That's what you were doing for the last hour." In this comment, the trial judge quite correctly characterized the error that ran throughout cross-examination by plaintiff's counsel. Mr. Fieger responded, "He kept objecting. I would love to ask her these questions. Objection." Similar instances of Mr. Fieger arguing with the judge or ignoring the authority of the court pervaded the trial.

{¶ 91} Mr. Fieger asked the doctor, "When you said emergency C-section, it's your claim here at your trial that you didn't really mean emergency? That's a

yes or no? You didn't really mean emergency?" The doctor responded, "That's not a yes or no answer, I will give you an answer if you would like one." The court then told the doctor, "You give the answer you want to give." The doctor then repeated the explanation the nurses and anesthesiologist had given earlier: "We use the term emergency loosely, all of us use it, and it simply means the patient was not scheduled in advance to have a C-section. So without being scheduled, it was emergent.[6] It does not mean that we automatically are going to run down the hall at top speed. And it was a poor use of the term and it should not have been used that way."

{¶ 92} Mr. Fieger then discussed the pediatrician whose presence Dr. Jordan had requested for the delivery. In another loaded question, at least purportedly a question, Mr. Fieger referred to the pediatrician as "[t]he pediatrician who you called in to help because you knew the baby had been asphyxiated because you waited so long." Dr. Jordan responded, "[T]hat's ridiculous." The pediatrician had noted on the chart that the baby was in fetal distress. When Mr. Fieger questioned Dr. Jordan about that note, Dr. Jordan explained: "He may have heard there was some decels[7] and decided there was fetal distress." Dr. Jordan then clarified he did not consider the baby's heart rate as shown on the fetal monitor strip to be fetal distress. Ignoring the copious previous testimony explaining the ambiguity of the term "fetal distress," Mr. Fieger asked Dr. Jordan why the nurses would have obtained a consent form from the mother indicating fetal distress as the reason for the C-section.

{¶ 93} Another area Mr. Fieger focused on was Dr. Jordan's location between the time he ordered the C-section and the time the skin incision was made. Dr. Jordan repeatedly stated that he did not remember this specific particular case, but that he probably was on the labor and delivery unit, although he was not "standing hovering over the patient." The doctor affirmed that in his years of practice he had never left the hospital after he had arranged for an unscheduled C-section. Mr. Fieger nonetheless continued, throughout the trial and into closing argument, to claim implicitly and explicitly that Dr. Jordan had abandoned the patient.

{¶ 94} During the defense case in chief, Mr. Fieger continued to question Dr. Jordan about his alleged dawdling. Mr. Fieger "restated" Dr. Jordan's explanation as "You are saying emergency C-section doesn't mean emergency C-section and fetal distress doesn't mean fetal distress." Defense counsel interjected, "Objection. He's arguing with the witness. The tone of his voice, it's getting

---

6. "Emergent" as used by medical personnel is synonymous to "emergency."

7. "Decels" is an abbreviation for deceleration of the baby's heart rate.

ridiculous." The court responded, "I'm aware that he's making a speech. Let's ask a question." Mr. Fieger then said, "But anybody else besides you who is trained in OB knows that fetal distress means fetal distress and emergency C-section means emergency C-section." The court asked him whether he had any questions to ask and warned: "Ask questions, counsel, instead of making speeches." Despite this warning, Mr. Fieger continued to make speeches throughout the trial.

{¶ 95} The defense experts received the same treatment. Mr. Fieger's attempts to impeach the credibility of one doctor, Dr. DiPalma, on the standard of care included the statement: "Well, in all fairness, to you nothing is a breach of the standard of care. That's why you're here, right?" Defense counsel objected, and the court stated, "Objection is sustained. That's outrageous. Next question." Despite the court's strong rebuke, Mr. Fieger later returned to this claim in his closing argument when he again denigrated the defense expert witnesses' credibility and integrity.

{¶ 96} When he asked the same witness about the standard of care for a child in fetal distress, the witness said: "You have used the term fetal distress which I honestly have a difficult time defining." The witness had previously testified that "fetal distress" is an ambiguous term which covers a broad spectrum of conditions, some immediately life threatening and some not. Mr. Fieger then asked him, "How could you offer testimony in this case where [fetal distress is] written by doctors all over this chart and you don't understand [fetal distress]?" Again, plaintiff's counsel improperly characterized the expert's sophisticated awareness of a term's multiple meaning as a failure to understand the term.

{¶ 97} When Mr. Fieger asked this doctor whether a nonreactive stress test signals fetal distress, the witness answered, "The baby can be asleep and not react." Mr. Fieger responded, "I'm not asking you to make excuses. I'm just asking you to agree that the——." Defense counsel interrupted with an objection, and the court replied, "Objection sustained. That wasn't a question. That was a speech. What was your question?" Mr. Fieger told the court, "I'm asking the witness to answer the questions, not answer some other questions. My question is very simple." The court was correct. Plaintiff's counsel was again misleading the jury by his improper comment inaccurately describing the answer as "making excuses."

{¶ 98} The primary point of contention in this case was the cause of Walter's brain damage. This expert witness, who is a maternal-fetal medicine specialist, explained why he believed that Walter's brain damage occurred weeks or months prior to his birth. The meaning of "birth asphyxia" was extensively discussed. The expert indicated that birth asphyxia meant that the child was deprived of oxygen at some point between conception and birth. In an effort to discredit this

expert on cross-examination, Mr. Fieger responded to the expert's opinion with, "Well, so it's your position that you know better, even though you don't take care of babies, than the pediatricians at Rainbow Babies Hospital who actually cared for him? You know better, correct?" Again, Mr. Fieger used the same technique of improperly attacking a professional opinion by attributing the professional disagreement to a flaw, an alleged sense of superiority, in the witness. His response to the expert also ignored the fact that this expert specializes in the exact area on which he was testifying, whereas pediatricians specialize not in this area, but rather in treating the baby *after* it is born.

{¶ 99} Another area of disagreement between the two parties' experts concerned Walter's multiorgan failure and the significance of when it manifested itself. When this witness testified that multiorgan involvement did not show up at delivery, but that it did show up later, Mr. Fieger, implying that the expert had changed his testimony, said, "You said the infant exhibited no evidence of multiorgan system involvement in the neonatal period. [You] most certainly did." In an attempt to discredit the expert, Mr. Fieger again abused technical words by giving them meanings they do not have.[8] And again he improperly commented on the testimony.

{¶ 100} This expert had testified that it was his opinion that Walter's brain damage had happened during the pregnancy and not during the birth, although he noted that, with the baby in the mother's uterus, it was impossible to determine exactly when the damage had occurred. When Mr. Fieger asked what evidence existed that the brain damage occurred during the pregnancy and not during the birth, the expert answered, "There is no evidence in the record." In responding, Mr. Fieger again improperly commented on the answer: "So you are making it up."

{¶ 101} The doctor and nurses who cared for Walter's mother during her pregnancy all testified that Pitocin had been administered to her as a test to determine how well the baby would tolerate a vaginal delivery. All had testified that the amount of Pitocin used in the test was minimal compared to the amount that would be used to induce or strengthen a mother's labor. Mr. Fieger asked the defense fetal-maternal health expert witness about the administration of Pitocin in a pregnancy when the fetus was showing the type of heart rate changes that this child was experiencing. The expert had published a paper saying that the use of Pitocin, a drug which causes uterine contractions, in a mother in active labor whose fetus showed this certain type of heart rate, is dangerous. Mr.

---

8. The witness clarified that the multiorgan involvement occurred later than the neonatal period.

Fieger tried to imply that the Pitocin test was malpractice.[9] The witness explained that his paper was discussing the use of Pitocin for a mother who was already in active labor, not for one who was not yet in labor. He further explained that the use of Pitocin for the patient in the case at bar was appropriate, because the mother was given a very low dose, she was not in active labor, and the test was stopped as soon as the information needed was obtained. Mr. Fieger responded, "I'm sorry. You've testified repeatedly in this state under oath that you never give it to a baby in fetal distress." The court asked: "Is that a question?" Mr. Fieger then continued to question the witness about his former testimony, but never showed him the purported testimony, despite the witness's request to see what he was quoting from. Inaccurately describing the evidence, Mr. Fieger then said to the witness, "For instance, in this case, all the evidence shows [the brain damage] happened in the hours before birth, 100 percent of the evidence, and zero shows it happened before. And you are unwilling to accept that; isn't that true?" The court only asked, "[I]s that a question?" and never noted the impossibility of being asked to verify such an imprecise statement and such a bewildering use of the word "before." Mr. Fieger's question—"[I]sn't that true?"—at the end did not transform what was yet another example of his misleading comments on testimony and evidence.

{¶ 102} Other defense expert witnesses received the same treatment. When asking the defense neonatology expert if he had testified for the defense law firm before, Mr. Fieger stated, "I guess you are in their Rolodex, right, for people that they need if one of their clients is getting sued and they need somebody to come up and say that the baby's injury happened way before the doctor committed malpractice, you're on their Rolodex, right?" The doctor responded that Mr. Fieger's statement was "a gross misrepresentation" and that he "resent[ed] it very much." Astonishingly, no objection or comment from the court occurred, perhaps from a sense of hopeless exasperation.

{¶ 103} Nor was the nursing expert spared Mr. Fieger's treatment. He asked the defense nursing expert, who testified about the standard of care required of nurses, whether it was below the standard of care for the nurses to not document the time the patient arrived on the unit. She responded, "It was below the standard of care as far as documentation. I don't believe it affected the care she received." Mr. Fieger said, "That's not for you to decide, ma'am. That's for the jury to decide." After an objection, which the court overruled, Mr. Fieger stated, "Again, I don't want you to editorialize. If you can give me your answers, okay?" Defense counsel again objected, and Mr. Fieger said, "I object to a witness

---

9. In the Pitocin test, a minuscule amount of Pitocin is given for the very purpose of assessing the response of the fetal heart rate prior to active labor.

editorializing for the same reason you did." This time the court told him, "You ask the question. If you don't like the answer, that's too bad. Next question." However, Mr. Fieger's earlier editorial comment sharply attacking the nurse's ability to prioritize elements in the standard of care was allowed to remain.

{¶ 104} Mr. Fieger then proceeded to inquire of the nursing expert witness why she had not asked the attorney who retained her about the documentation as to the time the patient arrived at the hospital. She responded that she had reviewed the records and noted that the arrival time was not documented. He asked her, "Well, did you ask the people who retained you or somebody at Sinai Hospital why it wasn't where it was supposed to be?" She said, "I didn't ask." He challenged her, "Why didn't you? Didn't you want to know?" A defense objection was sustained. However, Mr. Fieger continued to ask, "Why wouldn't you want to know what they did wrong?" The court, again sustaining defense counsel's objection, warned: "She didn't say she didn't want to know. Don't be so cute. Ask your questions, will you?" At this point—two thousand pages into the trial—"cute" is an understatement. Mr. Fieger's repeated improper questions were designed to mislead the jury by improperly discrediting a witness. He continued to use the same technique, implying in his questions that the staff was indifferent, despite there being no basis to do so in the evidence.

{¶ 105} Mr. Fieger then inquired into the nursing expert witness's previous times serving as an expert witness, saying, "You apparently have been retained by [defense counsel's] law firm on three or four other occasions to testify that nurses did nothing wrong, correct? * * * And you've always concluded for [defense attorney] that they did nothing wrong, right?" She answered, "I may have had a case I didn't want to defend." When he asked her which case that was, she said she did not know. He said, "Well, then please don't make up things." He again improperly inferred fabrication from the word "may."

{¶ 106} Mr. Fieger also inquired of the nursing expert about fetal distress. When he asked what she thought was the appropriate response to fetal distress, she responded that "[f]etal distress is a fairly ambiguous term." He asked her, "You know that fetal distress under ACOG and other organizations that it's now become a medical nursing emergency that nurses must react to, isn't that true?" Her response was, "Well, you don't want to take it out of context. I mean, I said fetal distress is a fairly ambiguous term. And this baby did have distress, yes, and it was in chronic distress. It was not acute." Mr. Fieger told her, "That's not for you to decide. You are not the—." The court interrupted him here; "Wait, wait. You asked her a question. Now you got it. * * * You can't have it both ways."

{¶ 107} Mr. Fieger continued to be dissatisfied with this witness's answers. When she testified that this record showed "decreased" variability, not "absent"

variability, Mr. Fieger said, "No. You don't have a right to make a medical diagnosis. The doctor said there was absent variability. Didn't you read that record? Absent variability written by Dr. Jordan." Defense counsel interjected, "That's not referring to fetal distress." Mr. Fieger responded, "Oh my God, Judge, that's * * * please." The court said, "You are testifying for the witness. So why don't all of us—." Mr. Fieger interrupted the judge, saying that "[t]his is cross-examination," and proceeded to question the witness. This excerpt clearly demonstrates the misconduct of plaintiff's counsel, who at this point appears uncontrollable.

{¶ 108} This expert was certified in inpatient obstetrical nursing with a special qualification in electronic fetal monitoring, which included the very strips she was testifying about. The witness said that the strip did not show "flat line." Mr. Fieger asked her about the pediatricians who charted that the baby was flat line, and she responded that they had not interpreted the strip correctly. Ignoring her special expertise, he chided her in the form of a question: "So you are here telling us what's appropriate for pediatricians?" She pointed out that pediatricians "don't interpret or analyze fetal monitor strips."

{¶ 109} Turning to Dr. Jordan's notes about a strip taken at his office and described as a flat line—a strip not preserved in the record—Mr. Fieger said: "We have to assume that one existed if they said it existed." She again explained that pediatricians who are not trained in the appropriate analysis would misinterpret it. In a question mischaracterizing her explanation as assuming the strip in the record "exists, but the other one doesn't," he asked why she made such an assumption. When she answered, "I don't assume that," he then again improperly commented on her testimony: "Well that's all you've been doing." The defense objected and the court remonstrated Mr. Fieger, saying, "Hold it. That's outrageous conduct. * * * That's outrageous conduct. You can criticize her out in the hall later if you want to. Not in here." This stern rebuke had no effect, however, on Mr. Fieger's questions or behavior.

{¶ 110} Mr. Fieger went on to question this expert also about the term "emergency." He said, "Well, I thought you tried to suggest to the jury that in 1987 somehow the word emergency doesn't mean emergency to a nurse. And so an emergency C-section for fetal distress really wasn't an emergency. Did you try to suggest that?" She explained that there were two boxes on the preprinted nursing forms: "scheduled" and "emergency." When he began discussing ACOG standards, she asked him where he was getting his information. After looking at the book he was consulting, she pointed out that he was looking at the wrong set of standards: instead of looking at the standards for women who are not yet in labor, he was looking at the standards that apply to women who are in the process of giving birth and in active labor. Mr. Fieger responded: "If a mother

isn't in labor but the nurses know the baby is in distress, the policies don't apply?" The expert answered, "I'm trying to tell you the difference that it says there. You know, you were trying to make me say something that I didn't want to say." Indeed, the witness understood what plaintiff's counsel was attempting throughout the trial.

{¶ 111} After the nurse expert explained that the nurses caring for Walter's mother had removed the monitor when they took her to the operating room, he asked her, "That's their job to make sure that if the surgeon isn't there, they protect that little baby who could be suffocating, isn't it?" She pointed out that the chart reflected that the nurses had regularly monitored the fetal heart rate. This nurse expert apparently had testified in a previous case, however, that when a fetus is in serious trouble, the nurses must hunt down the doctor with the vigilance of a pit bull. Mr. Fieger used this prior testimony to ask the nurse expert about the nurse's responsibility for finding a doctor "after an emergency C-section is called for a baby in fetal distress for two hours fulfilling their obligation to being the pit bull for that little baby's health?" An objection was sustained because the question relied on facts that were not in evidence. The image of a vigilant pit bull that remained, however, could help to explain the jury verdict.

{¶ 112} On recross, Mr. Fieger continued to ask her about her testimony on direct concerning the fetal strips. She said, "fetal distress [is] very ambiguous. There are gradations of fetal distress. That's why ACOG has said that we try not to use that term because it's so ambiguous." Again improperly commenting, Mr. Fieger responded, "You had no problem answering it when you were answering Dr. Jordan's attorney." Instead of striking the comment, the court said to him, "Do you have another question?"

{¶ 113} Mr. Fieger's argumentative comments were not limited to his questioning of defense witnesses. One of the documents in evidence was the report of the cord blood gases [10] recorded immediately after delivery. These cord blood gases were processed on a small machine, which printed out a report onto a small slip of paper. The staff in the operating room, where the machine is located, then handwrote on the slip when they were obtained. When he was questioning his own expert on the baby's cord blood gases, Mr. Fieger belittled this evidence by referring to the slips as "[t]hese things that look like shopping center receipts, that the word cord blood is written in." Both defense counsel objected, and Mr. Fieger defended his description, saying, "That's what it—that's only for the

---

**10.** A report of cord blood gases is an analysis of the pH of the blood found in the umbilical cord of the baby. This pH tells the doctors important information about the status of the baby at that specific point in time.

record, Judge. Look at them. They look like the things you get from a drug store." The court responded, "You can argue that when the time comes. That's not an appropriate question."

{¶ 114} At another point in the trial, when questioning his plaintiff's expert witness, Mr. Fieger asked him, do "you wait two hours to do surgery on a baby that's suffocating? That's called malpractice, isn't it?" The court sustained a defense objection, but made no curative instruction.

{¶ 115} Another example of Mr. Fieger's unacceptable tactics was a question he asked his economic expert: "By the way, none of your amount of money necessary to provide for this child included the costs that would be necessitated by the legal representation of Walter, do they?" The court sustained the objection and later gave a curative instruction.

{¶ 116} I believe that the small portion of the transcript I have just presented is representative of the entire 2,400 pages and clearly demonstrates that the misconduct of plaintiff's counsel was so outrageous that the trial judge properly granted a new trial.

## CLOSING ARGUMENT

{¶ 117} Even if the record had shown a model trial up until closing argument, Mr. Fieger's closing argument alone is sufficient to justify a new trial. He began by telling the jury that "it's really kind of amazing, ladies and gentlemen, that we have a justice system that allows the poor, terribly injured African American to stand on equal footing with powerful corporation defendants, doctors who did this to him and seek justice." He then informed the jury that the doctors and hospital defendants in this case "have used those [corporate] resources * * * to deny him justice to this day for 17 years." [11] "Scripture tells us through Isaiah that we must give voice to the poor and justice to the oppressed. I've come here to be a voice for Walter. Whatever you do to the least of my brother, that you do unto me." [12] He then told the jury that "Walter is depending upon you and God for justice, and your verdict will be the only justice that he ever gets."

{¶ 118} Mr. Fieger emphasized that the evidence for his case is overwhelming, "an avalanche" of evidence. "There isn't any evidence to counter this except what the defendants manufactured in this case." His use of the word "manufac-

---

**11.** This case was first filed on April 21, 1998, six years before the trial. Plaintiff dismissed it and later refiled it on October 16, 2002. Trial began on May 4, 2004. The actual case at bar took less than two years to go to trial.

**12.** Referring to the economic disparity between the parties is usually considered grounds for mistrial. See *Book v. Erskine & Sons, Inc.* (1951), 154 Ohio St. 391, 399–400, 43 O.O. 334, 96 N.E.2d 289.

tured" implicitly tied together a long line of improper comments throughout the trial attacking, without basis, the integrity of defendants' witnesses.

{¶ 119} The following excerpts from Mr. Fieger's closing argument suffice in demonstrating the need for a new trial:

{¶ 120} "I am standing here as the voice of Walter. Walter is a baby in his mother's womb waiting to be born. Doctors, nurses, I'm suffocating. Please help me be born." (This ploy is an offensive, raw appeal to the passions of the jurors and is employed throughout closing argument.) [13]

{¶ 121} "IUGR [intrauterine growth retarded] babies are always born without damage and develop normally if the right precautions are taken by the doctors and nurses." Those precautions are the same today as they were in 1987. (Evidence at trial showed that this statement is false.)

{¶ 122} "Nobody in medicine—and that's why they couldn't find doctors who would come in here and testify against any of the records because nobody in medicine in the face of fetal distress and an emergency C-section be [sic] called would ever say it's okay to wait two hours while a little baby suffered asphyxia and suffered brain damage." (Defense experts testified extensively to the contrary.)

{¶ 123} Mr. Fieger then accused the doctors of refusing to take responsibility for their actions. "And [Walter] bears no responsibility. I am suffocating. Help me be born."

{¶ 124} "They knew Walter was IUGR. They knew that he was high risk. They knew that Walter was in trouble. At the defendant Jordan's office when he did the nonstress test that's missing now, he knew Walter was in trouble. Dr. Jordan, help me be born."

{¶ 125} "They ask you now to incomprehensibly leave every single one of your common senses at the door and believe that a young 17–year–old woman can walk into a hospital, take a wheelchair, wheel around the hallways looking for labor and delivery without anyone checking her in or recording when she arrived, without anyone asking her about reimbursement questions." (The testimony was that no one, including the mother, remembered how she arrived at the labor and delivery unit. The chart indicated that she arrived in a wheelchair.)

{¶ 126} "The issue of when [the mother] arrived at the hospital is relevant to show how long they first waited to do anything for a baby that was in trouble, that was recognized to be in trouble, and that needed to be taken out immediate-

---

**13.** *Rosenberger Ents., Inc. v. Ins. Serv. Corp. of Iowa* (Iowa App.1995), 541 N.W.2d 904, 908, granting new trial when improper attorney conduct during closing caused prejudice to opposing party: "Such melodramatic argument does not help the jury decide their case but instead taints their perception to one focused on emotion rather than law and fact."

ly. And it was at least an hour. They waited a whole critical hour before 6:45 while little Walter was being suffocated. Oh, please help me. Help me be born. I'm drowning. Every minute counts. Every second counts."

{¶ 127} Mr. Fieger said that his closing argument was shorter than "this period of time that that little baby was suffocating." "And they didn't start monitoring for another hour. Every minute, ladies and gentlemen—I can't stress it to you enough. This is an emergency." Mr. Fieger then proceeded to draw upon his previous mischaracterizations of testimony by using the word "emergency." "If you see a little baby in the bottom of a swimming pool and you stand there and look and you have a responsibility because you are the lifeguard and you don't go in and you walk away for hours, you are negligent. * * *

{¶ 128} "They didn't even start monitoring for another hour. Every minute, every second counted for Walter. Please—I give him a voice—someone please help me."

{¶ 129} Mr. Fieger also stated in his closing argument that the defense case was a coverup of a "sin." He told the jury "how this doctor and this hospital * * * can continue to do this in this courtroom is a sin only you can rectify."

{¶ 130} Mr. Fieger then proceeded: "What we know is when the fetal monitor was attached, it immediately, immediately showed that Walter was in trouble and needed to be delivered. Dr. Jordan, please, nurses, please help me be born." (Defendants' experts had refuted this conclusion when they testified that the child was in no immediate danger, although he would not be able to tolerate a vaginal delivery.)

{¶ 131} "The standard of care demands that when you have a high risk pregnancy and an IUGR and a mother that's showing spontaneous contractions and late decelerations who you know already has no variability or late variability and no reactivity, every bell and whistle in medicine goes off and says that baby is asphyxiating, that baby is suffocating, get that baby out of the bottom of that pool. Get that child out."

{¶ 132} "They know what the standard of care is to do with an IUGR baby who has late decelerations in the face of spontaneous contractions, who has little reactivity, who has little variability. Get that baby out that baby is suffocating. Please, help me be born."

{¶ 133} "It's a code blue in the obstetrical unit. Emergency C-section, fetal distress. Emergency C-section, fetal distress. Emergency C-section, fetal distress. That's code blue. That's as bad as it gets. Every deceleration was weakening Walter, but instead the defendant Jordan orders Pitocin and makes things worse. I'm suffocating. Please, please help me be born."

{¶ 134} Again distorting the testimony about Pitocin, Mr. Fieger also told the jury that "Jordan ordered the use of the drug [Pitocin] that would cause little

Walter to suffocate even more." "The [Pitocin] test was not just a waste of time. It made the onset of irreversible brain damage come much sooner." (There was no evidence to support the claim that the Pitocin test had any effect on Walter's brain damage at all.)

{¶ 135} "They ordered an emergency C-section for fetal distress. They got a consent signed by mom for an emergency C-section for fetal distress. Every minute counted. Please, help me be born. * * * Please don't wait. Please, for God's sake, help him."

{¶ 136} "A precious hour later they wheeled [mom] at 8:25 into the operating room and left her there. Please, please help me be born." (The evidence showed that the mother was cared for continuously in the operating room by both nurses and anesthesia personnel.)

{¶ 137} In talking about the defense case, Mr. Fieger asked the jury: "Do you understand what's going on here? Do you understand the extent of the prevarication? Do you understand what they have done to that child for 17 years? Do you know why not one defense witness picked up these [x-rays]?" At this point, defense counsel objected, saying they did not have the burden of proof. The objection was sustained. Mr. Fieger continued, "They couldn't find an anesthesiologist." Defense counsel again objected. The court overruled the objection, despite the lack of evidence that defense counsel could not find, much less had even looked for, an anesthesia expert. "Thank you. They couldn't find anybody except somebody in their Rolodex. Where was Dr. Jordan? Where were the nurses? Where was the anesthesiologist? Where was the resident? I'm dying. Please save me."

{¶ 138} Beginning by implicitly denigrating the integrity of the defense's expert witnesses, Mr. Fieger concludes by suggesting, with no basis whatsoever, widespread deception. "The best they could do is look in their Rolodex and call Dr. Nowicki. How could they do that to Walter? What does that tell you about what's going on here and about the false stories they have spun? Oh what a tangled web we weave when first we practice to deceive." [14] He also continued to appeal to the passions of the jury: "Mommy, grandma, someone please save me. I'm dying. Please help me."

{¶ 139} "Every single one of the nurses had a responsibility, responsibility to Walter. Walter was their patient. And when that C-section didn't happen after 15 minutes and Dr. Jordan isn't there, they had a responsibility to do something. * * * They are not allowed to sit there. They are not potted plants. They had to go through the chain of command. They had to get it done as soon as possible

---

**14.** An attack on the integrity of the defense counsel or parties is grounds for mistrial. *Pesek v. Univ. Neurologists Assn.* (2000), 87 Ohio St.3d 495, 721 N.E.2d 1011.

because they are independent health care professionals who have an absolute responsibility to their patients. And nobody can blame anybody else and say it was his job. It's his job. Please, please nurses, I'm a little baby. I want to play baseball. I want to hug my mother. I want to tell her that I love her. Help me. Please help me to be born." Following is another appeal to passion and prejudice: "I'm sorry. I couldn't help you, Walter. I couldn't stop you from drowning. But I will be his voice. I will help him get justice now. Whatever you do to the least of my brothers, that you do unto me."

{¶ 140} After saying that the defendants were trying to cover up their malpractice by claiming the baby had been injured prior to the birthing process, Mr. Fieger said, "Ladies and gentlemen, how dare they? They can't deny Walter was born nearly dead with birth asphyxia because every single doctor who was there said it and wrote it down and wrote it down under oath and didn't come into this courtroom and refute the records." Mr. Fieger again misrepresented the evidence by describing Walter as "nearly dead." He continued, saying "I know that the court and these attorneys did not like the way I treated some of the witnesses." In this statement, plaintiff's counsel insulted the court by improperly implying that the court's admonitions were a result of merely "not liking" his manner.

{¶ 141} Again, Mr. Fieger improperly described the defense: "By the way, they also have to convince you that all of their witnesses who contradict each other are credible and right. They have to convince you that day is night and night is day. And they have to make you complicit in this injustice and believe that their people complied." [15] (He failed to show any contradiction between the defense witnesses.)

{¶ 142} For six more pages, Mr. Fieger continued to cloak himself as the minister of God or to pretend to become the voice of Walter.[16] In the process,

---

15. A similarly improper style was criticized in another medical case, in which the Supreme Court of Ohio observed: "Counsel for appellees made various assertions and drew many inferences that were simply not warranted by the evidence. * * * Appellees' counsel could have zealously represented his clients without resorting to these abusive tactics. Instead, counsel for appellees transcended the bounds of acceptable closing argument, creating an atmosphere 'surcharged with passion or prejudice.'" *Pesek v. Univ. Neurologists Assn.* (2000), 87 Ohio St.3d 495, 501–502, 721 N.E.2d 1011, quoting *Jones v. Macedonia–Northfield Banking Co.* (1937), 132 Ohio St. 341, 351, 8 O.O. 108, 7 N.E.2d 544. The court went on to say, "[I]f 'there is room for doubt, whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party.'" Id. at 502, 721 N.E.2d 1011, quoting *Warder, Bushnell & Glessner Co. v. Jacobs* (1898), 58 Ohio St. 77, 85, 50 N.E. 97.

16. Such a claim to the religious entitlement for judgment on a party's behalf has been repeatedly found to be grounds for a mistrial. See *Sandoval v. Calderon* (C.A.9, 2000), 241 F.3d 765, 779.

Mr. Fieger boldly misstated the evidence concerning damages: "As testified to by the life care planner, by the needs specified by doctors which you heard on the stand, the medical care requires for an R.N. home attendant care along with a myriad of other requirements which are listed in a health care plan table for which will be in evidence, a total, as Dr. Rosen indicated, $14,295,993." (As noted earlier in this dissent, none of the witnesses testified that Walter *required care* from an R.N.; he needed only a trained assistant, similar to a nurse's aide.)

{¶ 143} Mr. Fieger's closing argument contains many more examples of similar statements designed to inflame the passions of the jury. The excerpts I cite by themselves adequately support my conclusion that the trial judge was correct in ruling that a new trial was in order. However, to demonstrate the extent of his outrageous melodrama, I feel obliged to relate Mr. Fieger's final words:

{¶ 144} "I think Walter, if he could speak to you, might finally say this about all that's gone on: The day will come when my body will lie upon a white sheet tucked under the four covers [sic] of a mattress located in a hospital busily occupied with the living and the dying, and at a certain hospital a doctor will determine that my brain has ceased to function and that for all purposes, my life has stopped. When that happens, don't attempt to instill artificial life into my body by the use of machines and don't call this my death bed. Let this be called the bed of life and use whatever is usable to help others lead what you call lives. Give my sight to a man who's never seen a sun rise, a baby's face or the love in the eyes of a woman. And give my heart to a person whose only heart has caused nothing but endless days of pain. Give my blood to a teenager who is pulled from the wreckage of a car so that he might live to see his grandchildren play. Give my kidneys to one who depends upon a plan to exist. Take my bones, every nerve and muscle in my body to find a way to make a crippled child walk. Explore every corner of my brain. Take my cells if necessary and let them grow so that some day a voiceless boy will shout at the crack of a bat and a deaf girl might hear the sound of rain against her window. Burn what's left. Scatter my ashes to the window [sic] to help the flowers grow and if you must bury something, let it be my faults and my weaknesses and all of my prejudices against my fellow man. Give my sin to the devil and give my soul to God and if by chance you remember me, do it with a kind word or a kind thought to somebody who needs you. And if you do all that I have asked, I will live forever." This passionately presented fiction is akin to the razzle-dazzle tactic of attorney Billy Flynn in the film *Chicago*.

{¶ 145} Every good attorney walks a fine line between zealous advocacy and tainting a jury. Mr. Fieger pole-vaulted over that line early in this case and never retreated. I commend the trial court for having the integrity to recognize

684

the need for a new trial and ordering one. I would affirm the order for a new trial.

## APPENDIX

**PLAINTIFF'S ASSIGNMENTS OF ERROR IN CASE NO. 85286:**

"I. The trial court erred in granting defendants' motion for new trial when the verdict was supported by competent, substantial and credible evidence as to Walter Hollins' claim for damages.

"II. The trial court erred in directing a verdict in defendants' favor on plaintiff's claims for spoliation and punitive damages.

"III. The trial court erred in denying plaintiff's motion for prejudgment interest as moot."

**ASSIGNMENT OF ERROR ON MT. SINAI'S CROSS–APPEAL IN CASE NO. 85286:**

"I. The trial court erred in failing to grant Mt. Sinai's motions for directed verdict and judgment notwithstanding the verdict on plaintiff's claim that defendant Mt. Sinai is vicariously liable for the alleged negligence of a non-party, independent contractor anesthesiologist."

**DEFENDANTS' ASSIGNMENT OF ERROR IN CASE NOS. 85574 & 85605:**

"I. The trial court erred in granting plaintiff's motion for relief from judgment pursuant to Civ.R. 60(B)."